861 F.2d 1307
 57 USLW 2325, Fed. Sec. L. Rep. P 94,085
 In re DREXEL BURNHAM LAMBERT INCORPORATED, Drexel Burnham
Lambert Group Incorporated, Michael R. Milken,
Lowell J. Milken, Cary J. Maultasch, and
Pamela R. Monzert, Petitioners.
In re IVAN F. BOESKY SECURITIES LITIGATION.
SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
DREXEL BURNHAM LAMBERT INCORPORATED, Drexel Burnham Lambert
Group Incorporated, Michael R. Milken, Lowell J.
Milken, Cary J. Maultasch, and Pamela
Monzert, Defendants.
 No. 578, Docket 88-3060.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 31, 1988.
Decided Nov. 15, 1988.
 
 Peter Fleming, Jr., New York City (Eliot Lauer, Mark H. O'Donoghue, Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel), for defendants Drexel Burnham Lambert Inc. and Drexel Burnham Lambert Group, Inc.
 Arthur Liman, New York City (Martin Flumenbaum, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendant Michael R. Milken.
 Paul Gonson, Washington, D.C. (Thomas C. Newkirk, S.E.C., Washington, D.C., of counsel), for S.E.C.
 George Reycraft, New York City (Richard J. Wiener, Pamela Rogers Chepiga, Debra L. Brown, Cadwalader, Wickersham & Taft, New York City, of counsel), for Arden Way.
 David Berger, Philadelphia, Pa. (Berger & Montague, P.C., Philadelphia, Pa., of counsel), for class plaintiffs in In re Boesky Securities Litigation.
 Before LUMBARD, CARDAMONE and PIERCE, Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 A petition for a writ of mandamus has been presented seeking the disqualification of Senior United States District Court Judge Milton Pollack from presiding over certain civil fraud actions arising from claims of illegal insider trading. One action has been instituted by the plaintiff Securities and Exchange Commission (SEC or Commission) against the present petitioners, defendants Drexel Burnham Lambert Incorporated, Drexel Burnham Group Incorporated, Michael R. Milken, Lowell J. Milken, Cary J. Maultasch, and Pamela R. Monzert (Drexel). The other action is an amalgam of similar consolidated civil fraud actions instituted by individual plaintiffs that include the Drexel corporations as named defendants. Plaintiffs in both of these pending civil suits have appeared in opposition and have filed responses to Drexel's petition.
 
 
 2
 It is axiomatic that a judge may not preside over a case when his impartiality might reasonably be questioned. In deciding the sensitive question of whether to recuse a judge, the test of impartiality is what a reasonable person, knowing and understanding all the facts and circumstances, would believe. It is for that reason that we cannot adopt a per se rule holding that when someone claims to see smoke, we must find that there is fire. That which is seen is sometimes merely a smokescreen. Judicial inquiry may not therefore be defined by what appears in the press. If such were the case, those litigants fortunate enough to have easy access to the media could make charges against a judge's impartiality that would effectively veto the assignment of judges. Judge-shopping would then become an additional and potent tactical weapon in the skilled practitioner's arsenal. Instead, the sensitive issue of whether a judge should be disqualified requires a careful examination of those relevant facts and circumstances to determine whether the charges reasonably bring into question a judge's impartiality.
 
 I FACTS
 
 3
 We trace the facts and circumstances chronologically. Nearly two years ago, in December 1986, 11 shareholders' class action suits alleging injury as a result of insider trading were brought against Ivan Boesky and others, including Drexel Burnham agents. These actions were filed in the Southern District of New York and in the Northern and Central Districts of California. The suits brought in the Southern District of New York were assigned to Judge Pollack. In March of 1987 an additional civil fraud action, in which Drexel was also a named defendant, styled Arden Way Associates, et al. v. Ivan F. Boesky, et al., (Arden Way ), was begun in the Southern District. The two Drexel corporations were represented in these suits by Cahill Gordon & Reindel (Cahill Gordon) of New York City. As a result of the multiple claims asserted in these related class and individual actions, the Judicial Panel on Multidistrict Litigation, on July 24, 1987, brought together all the pending actions, including Arden Way, in the Southern District of New York for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. Sec. 1407 (1982). This request to transfer was addressed to Southern District Chief Judge Brieant with a suggestion that all of the class and non-class actions be assigned to Judge Pollack. An order consenting to the transfer was filed on August 5, 1987. The entire group of cases are referred to as "In re Ivan F. Boesky Securities Litigation " (Boesky Litigation ) and charged Drexel, along with other defendants, with acting in concert with Boesky and his affiliated companies to violate the securities and civil anti-racketeering laws of the United States.
 
 
 4
 For well over a year substantial pretrial activity has occurred in the class and non-class actions. Judge Pollack has issued three published decisions in the multi-district cases--one of which involved Drexel's motion to dismiss the Arden Way complaint. He also has issued 36 management orders resolving discovery disputes and establishing discovery schedules. Drexel has, in addition, litigated a number of substantive, procedural, and discovery matters before Judge Pollack.
 
 
 5
 In June 1988 while the Boesky Litigation against Drexel was in full swing, Palais Royal, Inc., a closely held corporation operating a retail chain in Texas entered into negotiations to sell its business in a leveraged buyout (LBO) transaction. The stockholders include Mrs. Moselle Pollack and members of her family. Mrs. Pollack, who is Judge Pollack's wife, is a controlling stockholder. The purchaser is Bain Venture Capital (Bain), which plans to carry-out the transaction through Specialty Holdings, Inc. (SHI), a corporation formed for the purpose of effectuating the acquisition. On June 29, 1988 the stockholders of Palais Royal entered into a contract--called an "Agreement and Plan of Merger"--to sell all of their shares to Bain in exchange for cash. Drexel is not a party to that agreement. The agreement is contingent on Bain's obtaining the necessary financing for the LBO. Bain agreed to use its best efforts to obtain financing on "terms reasonably satisfactory to [Bain]." The financing was Bain's exclusive responsibility, and, at Bain's request, none of the selling stockholders has had any contact with potential lenders. Reliable expert testimony in the form of an affidavit executed by Lewis L. Glucksman, former Chairman and Chief Executive Officer of Lehman Brothers Kuhn Loeb, which the district court credited, stated that the acquisition was not a difficult LBO to finance and that a number of investment banking firms could provide the financing on terms comparable to those offered by Drexel. This opinion was based on the fact that Palais Royal's current management has agreed to continue to operate the company after the consummation of the transaction, and that these same managers have, in recent years, operated the business profitably despite Houston's adverse economic climate. Glucksman concluded that the sale could be successfully financed with or without Drexel's participation.
 
 
 6
 When the sale occurs, no member of the now-controlling family will have any interest in Palais Royal. Further, Drexel will have no equity interest in the business. As the deal is now structured, Drexel will have no dealings with Palais Royal or with Mrs. Pollack. Its role is to act as a "best efforts" underwriter or "placement agent" of the debt to be issued by Bain. The dissenting opinion refers frequently to Drexel's role in financing the deal. Yet, even at the time of oral argument before us, Drexel stated that, though it was still exploring the matter and expected to participate, it still had no binding contractual obligation to act for Bain, i.e., to obtain the financing to enable Bain to conclude the transaction. Although Drexel may acquire an option to purchase 15 percent of the new company formed by Bain, it is not obligated to do so, and even if it were to purchase an equity interest in the acquisition vehicle, it would do so only after the Bain/Palais Royal deal had been fully consummated. Thus, Drexel's option to purchase equity securities in the new corporation created by Bain will only arise after Mrs. Pollack is completely disassociated from Palais Royal.
 
 
 7
 Bernard Fuchs, President and Chief Executive of Palais Royal, stated that, as management's representative (he is not a stockholder), he informed potential lenders with whom he met, including Drexel, that Moselle Pollack is the widow of the company's founder and the wife of Judge Pollack of New York. In addition, in late July or early August, 1988 Bain gave Drexel, as a would-be best efforts underwriter, a copy of the June 29, 1988 agreement, that listed Mrs. Moselle Pollack as a selling stockholder. Drexel's papers reveal that, in July 1988, it engaged in a substantial "due diligence" inquiry of Palais Royal, focusing on its closely-held ownership and control. In its negotiations with Bain, Drexel was represented by Cahill Gordon, its counsel of record. A Cahill Gordon partner acknowledged having received the June 29th Agreement and Plan of Merger on August 19, 1988.
 
 
 8
 Earlier, in the spring of 1988, George and Phyllis Asch, stockholders in Palais Royal, met with attorneys at Paul, Weiss, Rifkind, Wharton & Garrison of New York City (Paul Weiss). This law firm represents petitioner Michael R. Milken, a top Drexel official. George Asch claims that, at a meeting in the Paul Weiss law offices on June 2, 1988, the sale of Palais Royal was discussed, particularly with respect to the tax implications for the Aschs as New York resident stockholders. Asch further states that Moselle Pollack's relationship to Judge Pollack and her status as a stockholder in Palais Royal was fully known to Paul Weiss, as reflected in correspondence from a Paul Weiss partner who sent a copy of a letter concerning Palais Royal dated April 6, 1987 to "Mrs. Milton Pollack."
 
 
 9
 The present proceeding was precipitated on September 7, 1988 when the Securities and Exchange Commission, as plaintiff in the underlying civil enforcement action, filed an 184-page complaint against Drexel and others in the Southern District of New York in an action styled Securities & Exchange Commission v. Drexel Burnham Lambert Incorporated, et al., (Drexel Litigation ). The complaint, which has nothing to do with Palais Royal, alleges that Drexel and others had devised and carried out fraudulent insider trading schemes, manipulated stocks, and committed other violations of the federal securities laws. Counsel for Drexel maintains that two days later--on September 9--they first became aware that Judge Pollack's wife had a $30 million interest in the Palais Royal sale. After having been notified of the potential conflict by means of an ex parte telephone call placed by Drexel's attorneys on Saturday, September 10, the judge set a hearing in his chambers for September 13, where the situation was explored by the court and by counsel for the SEC and Drexel. The topic of recusal was broached by Drexel's counsel and was rejected by Judge Pollack.
 
 
 10
 On September 20th a formal motion to recuse was made. At two subsequent hearings--held on September 22 and 27--the district judge did not decide the motion and instead established discovery procedures. Arguments on the recusal motion were scheduled for October 11. Petitioners filed a mandamus application on September 30 in this Court, asking that Judge Pollack be recused in the Drexel Litigation, but they did not make the same application with respect to the Boesky Litigation. We denied the mandamus application as premature, noting that Judge Pollack had not yet ruled and that a hearing had been scheduled for October 11. Following the hearing, Judge Pollack handed down a written decision in which he denied the motion that he disqualify himself in either the Drexel Litigation or the Boesky Litigation.
 
 
 11
 On October 19 the instant mandamus petition was filed. We stayed the district court from conducting any further proceedings, set October 28 as the time for opposition papers to be filed and heard oral argument on the petition for the writ on October 31.
 
 II DISCUSSION
 
 12
 Petitioners urge that the district court judge be recused in this proceeding on three separate bases: (1) under 28 U.S.C. Sec. 455(a) because his "impartiality might reasonably be questioned" by reason of his wife's substantial interest in the Palais Royal transaction; (2) because his personal attacks on defense counsel's integrity purportedly reflect bias and accentuate the alleged appearance of existing impartiality; and (3) under Sec. 455(b)(4) because his wife has a "financial" or "other interest that could be substantially affected" by the outcome of the proceedings.
 
 
 13
 The SEC, plaintiff in the Drexel Litigation, and the class and individual action plaintiffs in the Boesky Litigation oppose the application for the writ. They argue, in substance, that Drexel's role is too remote from Mrs. Pollack's sale of stock to bring into reasonable question the judge's impartiality under Sec. 455(a); that there is no basis to conclude that the outcome of the litigation pending in the district court could affect Mrs. Pollack's interest in the Palais Royal transaction; and that the district judge's comments to counsel were an appropriate response in the circumstances. The Arden Way plaintiffs also argue that Drexel's untimely use of Sec. 455 was a part of its litigation strategy to manipulate the judicial process. Before we consider the statute, its legislative history, and its construction by this and other courts, we discuss briefly the scope of our review.
 
 
 14
 A. Issuance of a Writ of Mandamus and Scope of Review of District Court's Determination
 
 
 15
 An appellate court's power to issue a writ of mandamus upon a claim of wrongful refusal to recuse is inextricably related to the scope of review over the district court's determination. Hence, we discuss these subjects together. Although a court of appeals has authority to "issue all writs ... agreeable to the usages and principles of law," 28 U.S.C. Sec. 1651(a) (1982), "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." Kerr v. United States District Court, 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976); see also Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980) (per curiam). Further, it is well-settled that the exceptional remedy of mandamus will only be invoked where the petitioner has demonstrated that its right to such relief is "clear and indisputable." See Moses H. Cone Memorial Hosp. v. Mercury Constr. Co., 460 U.S. 1, 18, 103 S.Ct. 927, 938, 74 L.Ed.2d 765 (1983) (emphasis added); Allied Chem. Corp., 449 U.S. at 35, 101 S.Ct. at 190; In re International Business Machines Corp., 618 F.2d 923, 927 (2d Cir.1980). Were this not so, mandamus applications to review a judge's refusal to recuse would become an effective tactic for harassment and delay.
 
 
 16
 Discretion is confided in the district judge in the first instance to determine whether to disqualify himself, see Apple v. Jewish Hospital & Medical Center, 829 F.2d 326, 333 (2d Cir.1987). The reasons for this are plain. The judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion. In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case. See In re United States, 666 F.2d 690, 695 (1st Cir.1981). Litigants are entitled to an unbiased judge; not to a judge of their choosing.
 
 
 17
 A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is. See In re Union Leader Corp., 292 F.2d 381, 391 (1st Cir.), cert. denied, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961). Thus, upon reviewing this petition we must determine whether Judge Pollack can "indisputably" be said to have abused his discretion in denying the motion to recuse himself. In re United States, 666 F.2d at 697. As an appellate court, we do not ask ourselves whether we would have ruled in the same manner as did the trial court, but rather whether the district judge's decision is a rational one finding support in the record. See In re United States, 666 F.2d at 695. Further, in adopting the 1974 amendments to Sec. 455, Congress noted that the revised statute was "not designed to alter the standard of appellate review on disqualification issues." H.R.Rep. No. 1453, 93rd Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 6351, 6355 (House Report).
 
 
 18
 Thus, in reviewing the instant petition, we must bear in mind not only the standards governing recusal, but we must also consider the extraordinary showing required to obtain the issuance of a writ of mandamus. In other words, petitioners must "clearly and indisputably" demonstrate that the district court abused its discretion. Absent such a showing, mandamus will not lie.
 
 B. Statute and Cases
 
 19
 The pertinent provisions of 28 U.S.C. Sec. 455 provide as follows:
 
 
 20
 Sec. 455. Disqualification of justice, judge, or magistrate
 
 
 21
 (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 
 
 22
 (b) He shall also disqualify himself in the following circumstances:
 
 
 23
 (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; ...
 
 
 24
 (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
 
 
 25
 (1) Sec. 455(a)
 
 
 26
 Section 455(a) of the Judicial Code has a legislative history which sheds some light on the issue facing us. One of the purposes of the enactment was to "clarify" the grounds for disqualification. House Report at 6351. The amended section establishes an objective standard "designed to promote public confidence in the impartiality of the judicial process." Id. at 6354-55. Although the "duty to sit" concept has been removed--the House Report continues--the new test is not intended to permit judges to avoid controversial or difficult cases. Id. at 6355. Most significantly for our purposes, Congress noted that
 
 
 27
 The issue of disqualification is a sensitive question of assessing all the facts and circumstances in order to determine whether the failure to disqualify was an abuse of sound judicial discretion.
 
 
 28
 Id. (emphasis added). Thus, the test to be applied is an objective one which assumes that a reasonable person knows and understands all the relevant facts. See Pepsico, Inc. v. McMillen, 764 F.2d 458, 460 (7th Cir.1985); United States v. Ferguson, 550 F.Supp. 1256, 1260 (S.D.N.Y.1982). We disagree with our dissenting colleague's statement that recusal based on an appearance of impropriety under Sec. 455(a) "requires us to judge the situation from the viewpoint of the reasonable person, and not from a purely legalistic perspective." Like all legal issues, judges determine appearance of impropriety--not by considering what a straw poll of the only partly informed man-in-the-street would show--but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge.
 
 
 29
 The Supreme Court in Liljeberg v. Health Services Acquisition Corp., --- U.S. ----, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), emphasized that, in amending Sec. 455(a), Congress aimed to promote public confidence in the judiciary. Id. 108 S.Ct. at 2202. In Liljeberg, the Court was faced with the question of whether a judge who did not have actual knowledge of his direct fiduciary interest in the matter before him should nonetheless have vacated the judgment he had rendered in the matter after he learned of such interest. In affirming the circuit court's reversal of the denial of the motion to vacate, the Court concluded that, despite the judge's actual lack of knowledge, Sec. 455 imposed a stringent standard requiring a judge to inform himself about his personal and fiduciary financial interests. Thus, as a trustee of a university that had a direct stake in the outcome of the litigation over which he was presiding, the judge had a strong fiduciary interest in the resolution of the controversy which, the Court held, required vacatur of the judgment.
 
 
 30
 Conversely, where an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality. See In re Placid Oil Co., 802 F.2d 783, 787 (5th Cir.), reh'g. denied 805 F.2d 1030 (1986). Cf. Mavis v. Commercial Carriers, Inc., 408 F.Supp. 55 (C.D.Cal.1975) (district court cannot be disqualified because of ownership of stock in non-party oil company because a remote subsidiary of a corporation with which the oil company had engaged in joint ventures was a party in a proceeding before it).
 
 
 31
 In addition, it is essential to note that the procedural posture presented in Liljeberg differs significantly from the posture in which we are called upon to review Judge Pollack's denial of the recusal motion. Thus, as is more fully discussed below, Liljeberg is not only distinguishable from the instant case by reason of the directness of the link between the judge's fiduciary interests and the resolution of a case over which he was presiding, but more importantly, it is inapposite by reason of its procedural circumstances. In Liljeberg, the court of appeals was not faced with, as here, a petition for a writ of mandamus, but rather was presented with an ordinary appeal. In the instant case, we are called upon to invoke an extraordinary remedy which requires a showing that the district court indisputably abused its discretion. This clearly differentiates the standard of review applied in Liljeberg from that used in reviewing Judge Pollack's denial of Drexel's recusal motion.
 
 
 32
 (2) Sec. 455(b)(1)
 
 
 33
 Under Sec. 455(b)(1) what a judge learns or comes to believe in his judicial capacity "is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification." United States v. Bernstein, 533 F.2d 775, 785 (2d Cir.), cert. denied, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). A determination of bias under this section must be based on extrajudicial conduct, not conduct arising in a trial setting. Decisions or rulings must be adverse to a party, and legal disagreements with counsel are not sufficient for judicial disqualification under Sec. 455(b)(1), or, to state it another way, bias against a lawyer, even if found to exist, without more is not bias against his client. In re Cooper, 821 F.2d 833, 841-42 (1st Cir.1987). See In re IBM, 618 F.2d 923, 929 (2d Cir.1980) (trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias).
 
 
 34
 (3) Sec. 455(b)(4)
 
 
 35
 Further, Sec. 455(b)(4) states that a judge is disqualified if he or a family member has a financial interest in the subject matter of the litigation or is a party thereto. Courts faced with construing subsection (b)(4) have inferred that "any other interest that could be substantially affected" also means an interest in the subject matter of the litigation or a party to it. See Department of Energy v. Brimmer, 673 F.2d 1287 (Temp.Emer.Ct.App.1982); In re New Mexico Natural Gas Antitrust Litigation, 620 F.2d 794 (10th Cir.1980); In re Virginia Electric and Power Co., 539 F.2d 357 (4th Cir.1976).
 
 III ANALYSIS
 
 36
 We begin analysis of the facts and circumstances under Sec. 455(a) by setting them forth. First, we identify and analyze the charges of partiality and, second, we set forth the assertions made by respondents to the petition.
 
 A. Sec. 455(a)
 
 37
 (1.) Petitioners' Charges
 
 
 38
 Petitioners charge that because Mrs. Pollack is obtaining $30 million for the sale of her stock in Palais Royal there has been created an appearance of impropriety that requires Judge Pollack's recusal. The charge is based on the two premises: that Drexel's money will be paid to Mrs. Pollack and that Drexel is indispensable to the transaction. Neither statement is true. Mrs. Pollack has had no business or other dealings with Drexel; she will receive no money from Drexel; and Drexel is not essential to the completion or success of the transaction. Moreover, there is no nexus, direct, indirect or otherwise, between the civil suits pending before Judge Pollack and Mrs. Pollack's interest in Palais Royal.
 
 
 39
 Instead, the relevant facts are that Drexel has a potential commitment to Bain or SHI, not to Palais Royal or to Mrs. Pollack. If Drexel performs its role, the funds will belong to Bain and not to Palais Royal; if Drexel fails to perform for Bain or SHI, some other financial institution is likely to because it is a profitable opportunity. As previously noted, Lewis L. Glucksman states in an affidavit that a number of major investment banking firms could handle the placing of Bain's notes on terms comparable to those offered by Drexel. The facts support that conclusion. Palais Royal has operated profitably for 21 consecutive years despite recent regional hardship, and its present management will be retained by Bain.
 
 
 40
 Consequently, Judge Pollack's connection is too remote to mandate recusal because Drexel has no obligation direct or indirect to Mrs. Pollack. To adopt petitioner's theory would mean that any remote connection even, for example, to investors who buy SHI bonds from Drexel would mandate recusal. Thus, the price of avoiding any hint of impropriety, no matter how evanescent, would grant litigants the power to veto the assignment of judges. In our view, petitioners' theory would carry a worthy policy too far.
 
 
 41
 (2.) Respondents' Claims
 
 
 42
 We next set forth the assertions made by respondents through affidavits claiming lack of timeliness and an attempt by Drexel to manipulate the judicial process through judge-shopping. These assertions are not established facts upon which decision may rest. Yet, they constitute those circumstances that an "objective observer", see Liljeberg, 108 S.Ct. at 2203, or a reasonable person knowing all the facts and circumstances should consider in order to decide whether the failure to recuse was an abuse of sound judicial discretion. House Report at 6355.
 
 
 43
 A paralegal employed by the SEC states that when she attempted to file the underlying civil fraud complaint in the Southern District Clerk's office on September 7, defendant Lowell Milken's counsel who was waiting at the clerk's office--apparently having foreknowledge of her arrival--"tried to prevent [her] from filing the Drexel court papers." The Deputy Chief Litigation Counsel in the Enforcement Division of the SEC, also present at the Clerk's office on September 7, asserts in an affidavit that one of Drexel's attorneys "threatened that if the Commission filed its action as one related to those pending before Judge Pollack", he would seek Rule 11 sanctions against him and the other lawyers responsible for filing the action.
 
 
 44
 Immediately thereafter counsel representing various Drexel defendants and the SEC went to Judge Pollack's chambers where Drexel's counsel requested that the judge refrain from accepting the case until they had an opportunity to consult with other counsel. Three days later Drexel's counsel telephoned Judge Pollack at his house on Saturday afternoon September 10, ex parte, and without prior notification to SEC's counsel. The purpose of the call was to advise the Judge that Mrs. Pollack was going to get $50 or $60 million from Drexel. At the hearing held on September 13, Drexel's counsel, Thomas F. Curnin of Cahill Gordon, acknowledged that he could not be sure what the agreement provided because he had never seen the June 29th Agreement and Plan of Merger, which prompted his concern and brought about the ex parte telephone call to the judge's home. Based on this patently inadequate examination by a member of the same firm that had been representing Drexel in its negotiations with Bain, the judge made a strong Rule 11 comment. No one disputes that until the telephone call, Judge Pollack had no intimation of Drexel's role in assisting Bain finance its stock purchase.
 
 
 45
 At the September 22 hearing, oral argument on the recusal motion was set for October 11. On September 30, before the SEC had responded, Drexel filed its first mandamus petition before us, which we ruled was premature. At the October 11 hearing only Drexel urged Judge Pollack's disqualification. The plaintiffs in the Boesky Litigation argued that because Judge Pollack had been actively presiding over their cases for 18 months, his recusal would seriously prejudice them.
 
 
 46
 Because Drexel's counsel was before Judge Pollack defending Drexel in the Boesky Litigation for over a year, and because the same counsel represented Drexel in its negotiations with Bain--and saw the agreement between Bain and the selling Palais Royal stockholders--it seems plausible that Drexel knew or should have known in July or August, 1988 that Mrs. Pollack was a stockholder selling to Bain. Further, petitioner Michael Milken's counsel, Paul Weiss, apparently knew even earlier that Mrs. Pollack was a selling stockholder in Palais Royal. Moreover, Drexel's proposal to Bain did not occur until well after Judge Pollack had been assigned to preside in the multidistrict Boesky Litigation.
 
 
 47
 Whether Drexel's involvement in the Palais Royal transaction sprang from an improper motive is not now known. Yet, based on all the recited circumstances, respondents assert that to grant mandamus will establish a dangerous precedent permitting a party, by its own actions, to effect the recusal of a judge already presiding over the litigation. Of course, respondents' assertions are not established as matters of fact. Consequently, our decision does not turn on these assertions. Nonetheless, they are circumstances that a reasonable observer would want to know in deciding whether Judge Pollack's refusal to recuse himself created an appearance of impropriety.
 
 
 48
 We believe that, in light of the facts and circumstances that are known, a reasonable person would not conclude that the judge's impartiality could reasonably be questioned under Sec. 455(a). Such conclusion is reinforced because of the particular procedural posture in which this case is before us as a petition for a writ of mandamus. Certainly the circumstances just recited make it evident that petitioners have failed to establish the necessary clear and indisputable right to that extraordinary writ.
 
 B. Sec. 455(b)(1)
 
 49
 Petitioners' counsel claim that Judge Pollack's criticism of their behavior shows that the judge is personally biased and provides additional grounds for his recusal. To the contrary, counsel's misconduct drew what appears to us to be appropriate warnings from the district court. An appellate court, in passing on questions of disqualification of the type here presented, determines the disqualification on the basis of conduct which shows bias or prejudice or lack of impartiality by focusing on a party, not on counsel. The sharpness in colloquy between the judge and counsel, quoted by petitioners, does not demonstrate bias, but is well within the acceptable boundaries of courtroom exchange. See In re IBM, 618 F.2d at 931-32. Further, the remarks made by Judge Pollack challenged by petitioners were made in the context of judicial conferences and hearings and were directly addressed to the conduct of the attorneys before him; they did not extend to extrajudicial matters beyond that conduct. We see no reason for disqualification in these exchanges. Finally, petitioners argue that the district court's October 10 order to show cause why the motion to recuse should not be withdrawn and why Paul Weiss should not be investigated for its allegedly conflicting representation with respect to the Palais Royal deal is a demonstration of actual bias that mandates recusal under Sec. 455(b)(1). We cannot agree. Although we do not reach the merits of the show cause order, the trial court's actions do not reflect prejudice or lack of impartiality regarding the parties to the litigation. The substantive issues embodied in the order were directed at counsel's actions and are not therefore cognizable under Sec. 455(b)(1). Should litigation proceed to final judgment or other conclusion, and should bias later be found to have permeated the case, that situation may be corrected on direct appeal.
 
 C. Sec. 455(b)(4)
 
 50
 Finally, petitioners place little emphasis on Sec. 455(b)(4). They contend that Mrs. Pollack's participation in the Palais Royal transaction is an "other interest" that could be "substantially affected" by this proceeding, but do not explain how the outcome of this lawsuit could affect Mrs. Pollack's interest in the Palais Royal transaction, let alone "substantially affect" that interest. In fact, we see no basis to conclude that this litigation could have any effect whatsoever on the Palais Royal transaction. Hence, there is no merit to this claimed ground for disqualification.
 
 IV CONCLUSION
 
 51
 In sum, we conclude that an objective observer knowing and understanding all the facts and circumstances could not reasonably question Judge Pollack's impartiality. Petitioners have not clearly and indisputably established their right to a writ. Accordingly, for the reasons stated, the petition for a writ of mandamus is denied.
 
 LUMBARD, Circuit Judge, dissenting:
 
 52
 We should grant the writ of mandamus and direct Judge Pollack to recuse himself from consideration of these cases.
 
 
 53
 Events which no one could have foreseen, and which no one arranged, have created a reasonable doubt of Judge Pollack's impartiality in supervising these cases. Drexel inadvertently has been brought into a relationship with the financial interests of the wife of the judge who happens to be responsible for deciding litigation of great public importance brought against Drexel and four of its principals by the Securities and Exchange Commission (SEC) and individual plaintiffs. Judge Pollack has refused to recuse himself. The sole question before us is whether, in view of the wide publicity accorded these so-called insider trading cases, Judge Pollack's "impartiality might reasonably be questioned", 28 U.S.C. Sec. 455(a), by a reasonable person knowing the relevant facts.
 
 
 54
 To me, the inescapable relevant fact is that Drexel has been, and is now, retained by the firm which is under contract with Mrs. Pollack and members of her family to arrange financing for the cash purchase of Palais Royal, their family business, from which members of the family will receive over $84 million and Mrs. Pollack herself, and as trustee, will receive $30 million in cash. It is clear to me that a reasonable person knowing these ultimate conceded facts would reasonably question Judge Pollack's ability to supervise such litigation impartially. Such a reasonable person's next question would be "Why hasn't the judge stepped aside?" Moreover, Judge Pollack's expressed resentment to the suggestion of recusal and his castigation of Drexel and its counsel has confirmed these doubts. He cannot act impartially in these cases.
 
 
 55
 There is absolutely no evidence that Drexel agreed to act for Bain in order to manufacture a situation in which Judge Pollack's continued participation in ongoing litigation could be challenged. Drexel became involved in the Palais Royal deal in the same manner in which it might become involved in any of its deals. First, the stockholders of Palais Royal, consisting of Mrs. Pollack and family members, agreed on June 29, 1988 to sell the company to Bain Venture Capital (Bain) for over $84 million, on condition that Bain obtain financing for the purchase. Thereafter, Bain arranged with Drexel to obtain the necessary financing for the purchase of Palais Royal and another business with which Palais Royal is to be merged, in what is known as a leveraged buyout (LBO). It is undisputed that Bain sought out Drexel, a leading company in the successful and profitable managing of LBOs; Drexel did not seek to create a disqualification issue.
 
 
 56
 Moreover, there is no evidence that Drexel is not committed to this transaction. Although the majority suggests that Drexel may not be contractually obligated to Bain, the evidence before us leads to the opposite conclusion. The majority's attempt to deemphasize the nexus between Palais Royal and the instant litigation by hypothesizing that a court conceivably might find Drexel uncommitted to Bain is to brush aside both the uncontroverted evidence and the reasonableness standard of Sec. 455(a). Drexel already has agreed to supply in excess of $200,000,000; it has completed an extensive "due diligence" investigation. It also has an option to purchase 15% of the acquiring company. Although the June agreement fixes no closing date, the parties expect to close the deal sometime in November 1988.
 
 
 57
 The record is similarly devoid of any evidence which suggests that Drexel waited until an opportune moment to "discover" the conflict. On September 7, 1988, the SEC filed suit against Drexel and four of its principals seeking injunctive relief and disgorgement of profits. On the SEC's suggestion that this new action was related to other civil suits already supervised by Judge Pollack, it was assigned to him. Two days later, on September 9, Bain advised Cahill Gordon & Reindel (Cahill Gordon), Drexel's counsel, that the Moselle Pollack who had signed the agreement with Bain and who had a $30 million interest in the Palais Royal buyout was the wife of Judge Pollack. Drexel's attorney informed Judge Pollack by telephone on the very next day of Mrs. Pollack's interest in the deal.
 
 
 58
 When it became known to counsel for Drexel that the Moselle Pollack who would benefit from the buyout was the wife of Judge Pollack, the judge conducting the cases involving Drexel, it was their duty to bring the matter to the judge's attention without delay. The duty to inform a judge of a potential conflict rests upon whichever party becomes aware of such a situation. Any feelings which either party may have about the judge's favoring one or the other are wholly immaterial. To save embarrassment, time and expense, and the validity of any judgment, counsel have a duty to act promptly.
 
 
 59
 According to the undisputed evidence in the record before us, the Cahill Gordon attorneys who were representing Drexel in these cases did not know until September 9 that Moselle Pollack was the wife of Judge Pollack. Different attorneys in the firm had been representing Mrs. Pollack in her negotiations for the sale of Palais Royal, and nothing in the record indicates that anyone at Cahill Gordon knew of the link before September 9. If, as the SEC suggests, Drexel was anxious to get Judge Pollack out of these cases, it would seem that someone at Cahill Gordon would have acted as soon as the firm became aware that the judge was Moselle Pollack's husband. In sum, there is no reason to believe that Cahill Gordon could have acted any sooner than it did.
 
 
 60
 At this point in the proceedings, Judge Pollack's resentment at the idea of recusal became apparent. After conference with counsel in his chambers on September 13, Judge Pollack refused to consider recusal. He called the suggestion a "cockamamie story" and threatened counsel with sanctions for acting on "insufficient information."
 
 
 61
 On September 20, the petitioners filed a formal motion to recuse, returnable October 4, which Judge Pollack adjourned to October 11th. As the judge continued to rule on pretrial matters in the private civil cases, the petitioners sought a writ of mandamus on September 30. We denied the petition as premature in view of the hearing scheduled for October 11.
 
 
 62
 Meanwhile, on October 10, the day before he was to hear the recusal motion, Judge Pollack, on his own motion, issued an order directing Paul, Weiss, Rifkind, Wharton & Garrison (Paul, Weiss), which represents Michael R. Milken, a top Drexel official involved in the SEC litigation and the petition for recusal, and two of its partners, Arthur Liman and Martin Flumenbaum, to show cause why "they should not be required to identify and withdraw the papers on said disqualification motion which they have drafted, filed and served herein." With the order, Judge Pollack served copies of documents from his family's files to support his charge that, by joining in the recusal motion on behalf of the individual principals of Drexel, the Paul, Weiss firm was undertaking "conflicting" representation and acting adversely toward the Pollack family members, whom they had represented in other matters. At the October 11 hearing, Judge Pollack refused to hear argument on his order and referred the matter to Chief Judge Brieant "for disciplinary resolution, if required."It appears from this response to the recusal motion that the judge viewed the suggestion that he recuse himself from the Drexel litigation as adverse to the interests of his family--as if his continued participation in this litigation would be favorable to those family interests.
 
 
 63
 Judge Pollack's hostility towards the moving parties was repeated in his opinion of October 17. Judge Pollack emphasized the lack of "privity" between Mrs. Pollack and Drexel, writing that Mrs. Pollack's transaction "is not a Drexel-financed transaction." He also made much of the argument that Drexel is not essential to the deal and that Bain could easily retain one of Drexel's competitors to provide the required financing. In finding no reasonable basis for doubting his impartiality, Judge Pollack wrote that the "speculations" in which Drexel's lawyers engaged to "concoct[ ]" perceptions of impropriety seem so "far-fetched" as reactions of a reasonable person as to be "ludicrous".
 
 
 64
 My colleagues, in denying the petitioners' renewed application for mandamus, also rely upon the lack of "privity" between Mrs. Pollack and Drexel. Their argument rests on the fact that, instead of Drexel paying Mrs. Pollack with its own check for $30 million, Drexel will arrange the payment to a Bain subsidiary created for that purpose, which in turn will pay the $30 million to Mrs. Pollack. This can fool no one regarding who is responsible for raising the money and causing it to get to Mrs. Pollack. According to present plans, Mrs. Pollack will not get $30 million but for Drexel.
 
 
 65
 In this case, to impute a lack of privity is to exalt the form of the transaction over its substance, and to ignore the reasonableness standard of Sec. 455(a), which requires us to judge the situation from the viewpoint of the reasonable person, and not from a purely legalistic perspective. Drexel is integrally involved in this transaction and has been so for several months. It is largely because of Drexel's efforts that Mrs. Pollack will receive $30 million. That is the common sense of it; and it most certainly is the public perception that Mrs. Pollack is to be paid $30 million thanks to Drexel.
 
 
 66
 Of course, there might have been others who would be interested in working on the deal, but that is irrelevant. If Bain could have made other arrangements with a firm as well qualified as Drexel and on equally advantageous terms, it probably would have done so during the weeks when it was working on the deal and before it chose Drexel. In the absence of any showing of artifice on Drexel's part, the question is whether Judge Pollack reasonably appears not to be impartial. It is beside the point to assert that there is no showing that Drexel is indispensable.
 
 
 67
 The nature and extent of the interest of Mrs. Pollack and her family in the deal from which the family members will receive no less than $84 million is obviously of concern to Judge Pollack. His interest is considerably stronger than was the fiduciary interest of Judge Robert Collins, as a trustee of Loyola University, which the Supreme Court recently considered in Liljeberg v. Health Services Acquisition Corp., --- U.S. ----, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). In Liljeberg, Loyola had contracted to sell a tract of its land for about $6.5 million to John Liljeberg, Jr. for the construction of a hospital, subject to a buy-back clause which would be triggered if Liljeberg did not secure a construction contract within one year and Loyola did not receive certain benefits from the anticipated rezoning of Loyola's land adjacent to the hospital. At the same time, Judge Collins was presiding over an action in which a third party, with whom Liljeberg was contemplating building a hospital on a different site, was challenging Liljeberg's ownership of a state-issued "certificate of need" for a hospital. Had Liljeberg not won ownership of the certificate, which is required for the successful operation of a hospital, it is likely that the buyback provision would have been triggered and that Loyola would have lost the benefits associated with the hospital's construction.
 
 
 68
 Unlike Judge Pollack, who has been aware of his conflicting interest since the third day after the SEC filed suit, Judge Collins did not actually know about his fiduciary interest in the litigation until after he had filed his opinion. The Supreme Court nevertheless held that the judge's attendance at meetings of the Board of Trustees at which the prospective sale was discussed raised reasonable doubts about his impartiality and vacated Judge Collins' judgment.
 
 
 69
 The Liljeberg Court squarely held that whenever a question involving disqualification is presented, it is critical promptly to examine all possible bases for the judge's disqualification. Liljeberg, supra, 108 S.Ct. at 2205. The Court found unconvincing the facts that Loyola was not a party to the suit, that the judge was unaware of the conflict during the pendancy of the case, and that the judge's interest was only as a fiduciary rather than as a personal investor. What persuaded the Supreme Court to vacate the judgment after it was entered was the appearance of impropriety. As the Liljeberg Court said: "[P]eople who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges. The very purpose of Sec. 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." 108 S.Ct. at 2204-05 (footnote omitted).
 
 
 70
 Such an appearance of impropriety is, in fact, usually avoided by our federal judges as a matter of course. Since well before the amendment of Sec. 455 in 1974, it has been the custom of federal judges in the Second Circuit and elsewhere to recuse themselves whenever they or their spouses hold any stock or have any financial interest of any kind, however small, in any company or enterprise which is a party, or is linked with any party, in any matter coming before them. Each year every judge, including every senior judge who still sits, must file a statement of the stock holdings and other investments of the judge and the judge's spouse. That statement also reflects the sales and acquisitions of such interests during the preceding year. The spirit of these practices has been to resolve any doubt in favor of recusal. See United States v. Murphy, 768 F.2d 1518, 1536-41 (7th Cir.1985).
 
 
 71
 Moreover, the American Bar Association Code of Judicial Conduct requires that a judge recuse himself whenever "he knows that he ... or his spouse ... has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by [its] outcome." A.B.A. Code of Judicial Conduct Canon 3C(1)(c). Given the public attention that has been focused on the disclosures regarding insider trading and the public concern for the integrity of the marketplace, there is a heightened awareness of the importance of insuring the absolute impartiality of any judge who participates in the resolution of litigation concerning such activities. If Judge Pollack remains in charge of these cases, Mrs. Pollack's financial interest in Drexel's successful completion of the deal can only exacerbate these public concerns.
 
 
 72
 The cases relied upon in opposition to the petition for mandamus are inapposite. In Mavis v. Commercial Carriers, Inc., 408 F.Supp. 55 (C.D.Cal.1975), Judge Hauk held that recusal was not required where the judge owned some common stock in a subsidiary, twice removed, of a corporation that had done some business with the defendant company. In Mavis, the corporation indirectly owning the company in which the judge held stock had done business with the defendant in the past. The Palais Royal buyout, on the other hand, is happening now.
 
 
 73
 In re Placid Oil Co., 802 F.2d 783 (5th Cir.1986), held that the judge's ownership of stock in a bank did not mandate his recusal from a case involving unrelated banks. The argument in support of his recusal, that the outcome of the litigation might affect the banking industry generally, was speculative and too remote from the judge's investment in a different bank. 802 F.2d at 786-87. Mrs. Pollack's imminent realization of $30 million from the deal which Drexel is financing is hardly so speculative or remote.
 
 
 74
 Finally, I turn to the appropriateness of mandamus in this situation. While mandamus is indeed an extraordinary remedy, no cases have been cited that would bar the issuance of the writ in a situation as extraordinary as that before us. On the contrary, we have repeatedly held that mandamus is appropriate in recusal motions, believing that there are "few situations more appropriate for mandamus than a judge's clearly wrongful refusal to disqualify himself." In re International Business Machines Corp., 618 F.2d 923, 926 (2d Cir.1980) (quoting from Rosen v. Sugarman, 357 F.2d 794, 797 (2d Cir.1966)). See also In re United States, 666 F.2d 690, 694 (1st Cir.1981) (public confidence in the courts requires that questions of disqualification must be disposed of at the earliest possible opportunity). Moreover, we have held that the standard for review of a judge's refusal to recuse himself is not an abuse of discretion standard. Rather, we must query whether the trial judge could exercise that discretion in the face of a "personal, extrajudicial bias which precludes dispassionate judgment." In re International Business Machines, supra, at 926.
 
 
 75
 Fortunately, the proceedings in the suit brought by the SEC have just begun, and in the private civil cases discovery and pretrial proceedings are still underway. It is not unusual for cases to be transferred to other judges in the court as the need to do so arises. In addition to Judge Pollack, there are presently 23 active district court judges in the Southern District of New York and more than a dozen senior district judges who still sit. In the case before us, in which Drexel is underwriting a transaction in which Judge Pollack's wife will receive $30 million, we must act to avoid compounding the harm already done to the public's perception of the integrity of the judiciary.
 
 
 76
 A central pillar of our government is the people's confidence that our courts are free of bias or favor and are administered by judges who are unquestionably impartial. Whenever any reasonable basis to doubt a judge's impartiality exists, this public trust demands that we act swiftly and decisively.
 
 
 77
 We should grant the petition for mandamus and direct Judge Pollack to recuse himself.