Roger **SOLLENBARGER**, Raleigh K. Gardenhire, Charles Wheeler and Peter Naumburg, for themselves and all others similarly situated, Plaintiffs,

v.

**MOUNTAIN STATES TELEPHONE AND TELEGRAPH CO.,** d/b/a U.S. West, a Colorado corporation, Defendant.

Civ. A. No. 87–1485–SC.

United States District Court,
D. New Mexico.

Feb. 10, 1989.

Robert J. Dyer, III, Stutz, Dyer, Miller & Delap, Denver, Colo., George Gary Duncan, Santa Fe, N.M., for plaintiffs.

Dale R. Harris, Carole K. Jeffery, Denver, Colo., Montgomery & Andrews, Seth D. Montgomery, Victor R. Ortega, Sarah M. Singleton, Santa Fe, N.M., for defendant.

## OPINION AND ORDER

THEIS, District Judge, Sitting by Designation.

This matter comes before the court on defendant's Motion to Recuse the court. The court owns stock in four telephone companies who are *not* parties to the instant litigation. Mountain Bell (MB) contends that the Plan of Reorganization (POR), which governs the relationship between the Bell Operating Companies (BOCs) and AT & T, requires the court's disqualification.

The POR was a court mandated and approved settlement contract that broke up AT & T on January 1, 1984, the date of "divestiture." The POR mandates that liability for all pre-divestiture events which one BOC incurs is shared by that BOC and AT & T or with all BOCs and AT & T. MB argues the court's stock interests in nonparty BOCs and AT & T constitute a "financial interest in the subject matter in controversy" within 28 U.S.C. § 455(b)(4). Plaintiffs claim the court's stock interest falls within the second proviso of § 455(b)(4): "any other interest that could be substantially affected by the outcome of the proceeding." MB concedes that the court's interests would not be "substantially affected" by the litigation and disqualification would not be proper under the second proviso. After examining the cogent briefs, hearing lucid oral arguments and extensive deliberation, the court is prepared to rule.

FACTUAL AND PROCEDURAL BACKGROUND

This litigation was first filed in federal court in Sante Fe, New Mexico, in December 1987 as a state-wide class action. The suit alleged that all phone customers in New Mexico had invalid inside wire maintenance service contracts with MB based on several legal theories: state and federal antitrust, common law voidable contract and state statutory consumer fraud. The month-to-month service contracts covered the telephone wire that ran from the outside of the house to the phone jack on an inside wall. The allegedly actionable conduct began in late 1982, more than a year *before* the date of divestiture. After the federal judges in New Mexico recused themselves because of their membership in the potential plaintiff class, Chief Judge William Holloway of the Tenth Circuit Court of Appeals assigned the case to this

court in January 1988 to determine if a class action existed.

At the outset of the first hearing, *the court* raised the issue of its stock ownership:

> I've got some stock in some of the Bell Companies, none in Bell West but in some of the other split-offs from the, from A.T. & T. I have some stock in some of the other companies like Southwestern Bell, Bell South and one other one, I think, one on the east coast. I don't anticipate that there is any conflict of interest but, and even though I'm a stockholder I have no preference for any corporation in which I have any stock but *I think we ought to get it straight to begin with.*

Tr. of February 11, 1988 hearing at 4–5 (emphasis added). The court's concern was two-fold, one, that plaintiffs' counsel would expand the suit into the territory of the corporations the court owned stock in and, two, that counsel might raise an appearance of impartiality objection based on 28 U.S.C. § 455(a). *Id.* The court *at no time* had any knowledge of the POR until the filing of the Motion to Recuse in October.

Plaintiffs' counsel did not think Southwestern Bell had used the same allegedly illegal methods as MB. He thought the court's stock ownership would not cause any problem. *Id.* at 5. Plaintiffs' counsel was apparently unaware of the POR. MB gave a vaguely qualified statement of approval:

> With reference to the fact that you are a stockholder in Southwestern Bell and that sort of thing, we'll probably have to think about that, I don't myself right off the bat, think that entails a problem at this point but there may be other considerations.

*Id.* at 6 (Seth Montgomery). Peter Willis, Litigation Counsel for MB, appeared at the hearing. *Id.* at 2. Willis is one of MB's primary persons to handle contingent liability questions and is considered "knowledgeable" on the subject. MB's Answers to Set IV Interrogatories Nos. 1, 4, 16.

Subsequently, the court acted on a number of motions emanating from both sides and granted plaintiffs' motion to amend their complaint. The amended complaint expanded the composition of the class to all customers of MB from 1982 on in all seven states where it operates. The court denied MB's motion for an evidentiary hearing on class certification and granted the motion to certify the class in toto and a related motion on class notice. *Sollenbarger v. Mountain States Tel. and Tel. Co.,* 121 F.R.D. 417 (D.N.M.1988). The court then denied reconsideration. Shortly thereafter on October 11, MB filed the instant motion. The court informed the parties at a hearing on October 13 that he owned stock in Southwestern Bell, Bell South and America Tech. The court clarified his stock interests in an Order on October 17 by disclosing that he also owned stock in AT & T and providing the number of shares he owned in each corporation. Order at 2.

The POR is crucial to the recusal question; the court will examine it in some detail. When the United States District Court for the District of Columbia ordered AT & T to dismantle itself in August 1982, the court required AT & T to submit a POR to the Department of Justice. *United States v. Western Elec. Co., Inc.,* 569 F.Supp. 1057, 1061 (D.D.C.1983). Prior to implementation of the POR, the 1982 order required the POR to receive court approval. *Id.* The contingent liabilities section of the POR was one of the major issues briefed and argued on the motion to approve the POR. *Id.* at n. 3.

"Contingent liabilities are liabilities which are attributable to pre-divestiture events but do not become certain, and are therefore not booked, until after divestiture." *Id.* at 1069 n. 39. The 1982 decree allocated "to each Operating Company a proportionate share of the System's consolidated debt and equity; and the plan of reorganization provides that the post-divestiture entities will share in the contingent liabilities on the same basis." *Id.* at 1069. AT & T received approximately 25 percent of the net investment and the remainder was distributed to the BOCs. *Id.* at 1069 n. 39.

The apportionment of contingent liabilities in the same manner as debts and equity is based on two assumptions. The first and most important for the motion to recuse is that prior to the date of divestiture, January 1, 1984, the Bell System was a single entity. *Id.* at 1069. Much of the opposition to the contingent liabilities section of the POR emanated from the idea that certain parts of the Bell System were not at fault for the monopolistic conduct which led to divestiture and should not have to share in the liability. Judge Harold Greene squarely rejected this assertion:

> Until the time the reorganization takes effect, the Bell System is legally a single enterprise, with a single claim to the System's assets and a single responsibility for the System's liabilities. It is erroneous, therefore, to pose the problem in terms of imposing liability upon parts of the enterprise based upon fault or lack of fault; at the time the acts complained of occurred there was only one entity (the Bell System), and should there be a judgment in any particular case, that entity will have found to be at fault.

*Id.* at 1070.

The other major assumption is "that the residual risks of the System's pre-divestiture operations should be shared by all entities which receive a part of the System's assets." *Id.* at 1069. The court found that it was "reasonable for each of the post-divestiture entities also to receive a corresponding portion of the System's pre-divestiture business risks which encumber the equity." *Id.* at 1072. "(A)ll Bell System Companies are, in essence, insuring one another against the possibility that the contingent liabilities will become certain after divestiture." *Id.* at 1073.

The POR outlined a system for keeping track of and apportioning pre-divestiture liabilities. First, those liabilities in existence at the time of divestiture were placed on a schedule. A BOC sued after the date of divestiture must give notice to the other BOCs and AT & T of a new contingent liability to have it placed on the pre-divestiture liabilities schedule. POR at 189–90. Second, the liabilities on the schedule are

apportioned under the following rules. The general rule for claims over a million dollars is on "the basis of their relative net investment as of the effective date of divestiture." *Id.* at 187–88 and n. 215.

Several exceptions and exigent circumstance provisions are also relevant. If the liability stems from pre-divestiture *inter*state operations, AT & T and all BOCs share "in proportion to their relative investment devoted to interstate services." *Id.* at 188. But if the liability arose from *intra*state operations, "responsibility will be allocated between AT & T and the BOC that conducted the operations in that State. ... in proportion to the companies' relative investment devoted to intrastate services." *Id.* If the parties cannot agree on the operation of the POR, the parties can submit their disputes to arbitration. *Id.* at 190 n. 222. AT & T and the BOCs may agree to alter the scheme prescribed in the POR. *Id.* at 187. If a BOC *settles* a claim relating to pre-divestiture events, *no* liability sharing occurs. *Id.* at 190.

Discovery on the Motion to Recuse revealed several pertinent facts. MB provided notice of the institution of this litigation pursuant to the POR. MB has not entered into an agreement with any BOC or AT & T to waive the liability sharing provisions. Two other suits similar to this case have been settled by other BOCs; the POR contingent liability provisions were therefore not invoked.

## DISQUALIFICATION

■ In examining this issue the court is cognizant of the very recent observations by two circuits on the trend to make recusal motions part of standard litigation tactics. *In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307, 1309 (2d Cir.1988); *In re National Union Fire Ins. Co. of Pittsburgh,* 839 F.2d 1226, 1229 (7th Cir.1988). Armed with the knowledge of this trend, the court's task is difficult:

> In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse conse-

quences of his presiding over their case. *See In re United States,* 666 F.2d 690, 695 (1st Cir.1981). Litigants are entitled to an unbiased judge; not to a judge of their choosing.

*Drexel Burnham,* 861 F.2d at 1312.

The statutory provisions at issue are set out to facilitate the court's parsing of the language:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

\* \* \* \* \* \*

(b) He shall also disqualify himself in the following circumstances:

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a *financial interest in the subject matter in controversy* or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

\* \* \* \* \* \*

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(4) "financial interest" means ownership of a legal or equitable interest, however small,

. . . .

\* \* \* \* \* \*

(e) No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification *enumerated in subsection (b).*

28 U.S.C. § 455 (emphasis added).

The disputed subsection, (b)(4), is divided into two parts. *In re Cement Antitrust Litigation,* 688 F.2d 1297, 1308 (9th Cir. 1982), *aff'd for want of a quorum,* 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983). The second phrase begins "any other interest" and is the only part of the subsection modified by the qualifying language "substantially affected by the outcome of the proceeding." The first phrase begins with the term "financial interest" and is qualified by the phrase "in the subject matter in controversy or in a party to

the proceeding." 28 U.S.C. § 455(b)(4). MB specifically disclaims reliance on the "any other interest" phrase. Reply Brief at 3 n. 2.

The disputed ambit of the statute is even more narrow than the first phrase. The term "financial interest" is defined by the statute and is indisputably applicable here. 28 U.S.C. § 455(d)(4). The court's stock ownership is a legal interest within subsection (d)(4). The phrase "in a party to the proceeding" is not applicable here because the court's financial interests are in nonparties. Thus, the narrow, dispositive question is whether the court's financial interest is "in the subject matter in controversy."

Congress provided little explicit guidance on the meaning of this phrase. It is not defined later in the statute. Neither the parties nor the court have found any legislative history on the phrase. H.R.Rep. No. 1453, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 6351; 120 *Cong.Rec.* 36,267–270 (House 1974); 119 *Cong.Rec.* 33,029–030 (Senate 1973).

Plaintiffs proffer several general definitions offered by other courts for the term. One court reasoned that "(t)he use of the term 'subject matter' *suggests* that this provision of the statute will be most significant *in rem* proceedings." *Dept. of Energy v. Brimmer,* 673 F.2d 1287, 1295 (Temp. Emerg.Ct.App.1982) (emphasis added). The Third Circuit in *United States v. Nobel,* 696 F.2d 231, 234 (1982), *cert. den'd,* 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983), relying on *Webster's Dictionary,* argued that the only "relevant definitions of 'subject matter'" are " 'the matter acted upon', the 'matter presented for consideration', or the topic of dispute in a legal matter',...." Plaintiffs argue these two definitions demonstrate the narrowness of the phrase "subject matter in controversy." They contend the subject matter of this controversy is the legality of the inside wire contracts; an issue theoretically separate from the assessment of damages. Response Brief at 10. While the two courts' definitions, standing alone, may

provide some ethereal support for plaintiffs' assertion, an analysis of the facts and holdings in *Brimmer, Noble* and other cases convinces this court that a different definition of the phrase is appropriate.

■■■ The court generally agrees with MB's articulation of the test used by other courts when considering the phrase "subject matter in controversy." Reply Brief at 6, 8. In cases where the judge has a financial interest within § 455(d)(4) in a non-party, the court examines how direct an effect the litigation before it will have on the interested non-party. For example, in *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir.1986), plaintiff brought suit against 23 banks. The trial judge had a large investment in a non-party bank; the financial interest definition is satisfied. Plaintiffs argued for recusal under the "subject matter in controversy" phrase because the rulings the judge would have to make in order for them to recover would have a detrimental effect on all banks in the state. *Id.* The Fifth Circuit rejected plaintiffs' assertion. The court held that a potential effect on the banking industry of a state was "an indirect and speculative" event not covered by the first phrase of the statute. *Id.* at 786–87.

*Department of Energy v. Brimmer*, 673 F.2d 1287 (Temp.Emerg.Ct.App.1982), is similar to *Placid Oil*. Plaintiff energy company in *Brimmer* challenged the validity of regulations written to wind up a Department of Energy regulatory program. 673 F.2d at 1289–91. Judge Brimmer held stock in energy companies who participated in the same program plaintiff did; thus, he had a financial interest. TECA held that his interest in non-party corporations did not equal "a financial interest in the subject matter of the litigation before him" because "the judge does not have a *direct* economic or financial interest in the outcome of the case,...." *Id.* at 1295 (emphasis added). The court of appeals also held that his stock ownership did not constitute "any other interest" because his rulings could at most have a slight effect, not a substantial one. *Id.*

The direct effect test is also illustrated in two Indian land claim cases. *Oglala Sioux Tribe of the Pine Ridge Reservation v. Homestake Mining Co.*, 722 F.2d 1407 (8th Cir.1983); *Chitimacha Tribe of Louisiana v. Harry Laws Co., Inc.*, 690 F.2d 1157 (5th Cir.1983), *cert. den'd*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). In both cases the tribe sued for possession of certain areas of land. The judges in both cases owned land near the claims area but outside its boundaries. Land ownership fulfills the financial interest criterion. Both courts held, however, that because the suits could not effect the Judges' title to the land their interests were not within the "subject matter in controversy." The possibility that their property values might drop was not a direct interest sufficient to trigger the provision. *Oglala Sioux*, 722 F.2d at 1414; *Chitimacha*, 690 F.2d at 1166.

A final example is *United States v. Nobel*, 696 F.2d 231 (3rd Cir.1982), *cert. den'd*, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). The Third Circuit held "that a judge presiding over a criminal action who holds stock in a corporate victim of the crime does not have a 'financial interest in the subject matter in controversy.' " *Id.* at 235. The judge's stock ownership in the non-party corporation satisfied the financial interest test. The proceedings before the court could have no effect on the defrauded company. *Id.* at 234. Without any connection to his financial interest, the court's control of the proceedings did not draw his interest into the "subject matter" of the controversy.

Several commentators also recognize that the connection between the litigation before the court and the court's financial interest is the key element in the "subject matter in controversy" inquiry. 13A Wright, Miller & Cooper, *Federal Practice & Procedure* § 3546 at 600–02 (1984); Note, *Judicial Disqualification in the Federal Courts*, 67 Iowa L.Rev. 525, 532 (1982).

Plaintiffs place heavy reliance on *In re New Mexico Natural Gas*, 620 F.2d 794 (10th Cir.1980) and *In re Virginia Elec. &*

*Power Co.*, 539 F.2d 357 (4th Cir.1976). Both cases are inapplicable here because they turn on the "financial interest" definition, 28 U.S.C. § 455(d)(4), not the "subject matter in controversy" phrase. 28 U.S.C. § 455(b)(4). In both instances, the judges were utility customers of a litigant before them. If the plaintiff prevailed in each action, each judge may have received a slight economic benefit.

A judge's expectation that his utility bill might decrease slightly, *New Mexico Natural Gas*, 620 F.2d at 796, or that he might get a rebate on his utility bill, *Virginia Power*, 539 F.2d at 366–67, does not qualify as a financial interest. A financial interest is a "legal or equitable interest." 28 U.S.C. § 455(d)(4). Each judge, however, had no more than a *hope* that he would receive a benefit. The Fourth Circuit in *Virginia Power* declared that a potential benefit contingent on plaintiff winning the suit, recovering their entire damages and the actions of the Virginia Corporation Commission was too remote to qualify as a financial interest. 539 F.2d at 360, 366. The judge's interest "is closely analogous to what is known as a 'bare expectancy' in property law." *Id.* at 366–67. Therefore, the judge did not have a financial interest within 28 U.S.C. § 455(b)(4), (d)(4). *Id.* at 367. The Fourth Circuit then analyzed the judge's expectancy under the "any other interest" provision and determined his interest was not "substantially affected" by the litigation before him. *Id.* at 367–68.

The Tenth Circuit explicitly adopted the reasoning of the Fourth Circuit in *New Mexico Natural Gas*. The Tenth Circuit stated:

> We agree with the Fourth Circuit's determination that a remote, contingent benefit, such as a possible beneficial effect on future utility bills is not a 'financial interest' within the meaning of the statute. It is an 'other interest,' requiring disqualification under a 'substantially affected' test. *See In re Virginia Elec. & Power Co.*, 539 F.2d 357 (4th Cir.1976). We find Judge Bratton's interest here to be too insubstantial to require recusal.

620 F.2d at 796. The two utility cases on which plaintiffs rely define a part of the statute not at issue here. The court has no quarrel with the decisions; they simply are inapposite.

With a careful reading of the "subject matter in controversy" case law in mind, the court will examine whether the non-party corporations the court holds a "financial interest" in (AT & T, Southwestern Bell, Bell South and Ameri Tech, hereafter NPCs) are directly linked to the outcome of this litigation. The NPCs are part of the self-insurance plan at the heart of the contingent liability provision of the POR. *United States v. Western Elec.*, 569 F.Supp. at 1071, 1073. At least one of the NPCs will participate in the liability sharing process: if inside wire maintenance contracts are deemed *inter* state operations, all BOCs & AT & T will participate; if the *intra* state rule applies, AT & T alone will contribute. POR at 188. The court views the NPCs as a single group because at least one entity will "indemnify" MB. *Black's Law Dictionary* 662 (5th ed.1979) ("to make reimbursement to one of a loss already incurred by him").

While many events may occur between the present and the first potential payment by an NPC to MB, the court determines the nexus between this litigation and the NPCs is sufficiently direct. The subject matter of this litigation is the validity of the inside wire service contracts *and* the damages recoverable if invalid, perhaps exceeding 500 million dollars. Litigants bring suit to receive redress for the alleged wrongs committed against them; the redress normally takes the form of money damages. The judicially approved contract governs the relationship of the parties and will allocate all pre-divestiture liabilities. The POR creates legal and contractual interests for each NPC in the instant litigation. The court can hardly imagine a more explicit connection.

The connection in this case is quite unlike those in the "subject matter in controversy" cases discussed above. First in *Brimmer* and *Placid Oil*, the financial interest was in a separate entity that was in the

same industry as an actual litigant before the judge whose decisions would have a financial impact on the litigant as well as the separate entity. The contention rejected by both appellate courts was that the "subject matter in controversy" was the whole industry. In the instant litigation, the whole industry *is* before the court. As Judge Greene stated in *Western Electric*, the Bell System was one entity prior to divestiture. 569 F.Supp. at 1070. The contingent liability provisions continue to tie all the BOCs together for debts incurred when the now separate entities were one large, single entity.

The Indian land claim cases, *Chitimacha Tribe* and *Oglala Sioux Tribe*, illustrate a related point. In both, the court found no subject matter nexus because the judge's land was not within the claimed area. No ruling could have an effect on the validity of the title of land outside the area. *Chitimacha*, 690 F.2d at 1166; *Oglala Sioux*, 722 F.2d at 1414. To compare, the whole Bell System prior to 1984 was one large entity—one large claim area. An attack on the pre-divestiture conduct of any BOC is within the "claim area", the Bell System, under the POR. Plaintiffs attack one part of the Bell System, MB, and the POR implicates the entire unit, all other BOCs and AT & T.

Plaintiffs assert the connection between this litigation and the NPCs is contingent and remote. Obviously, numerous steps remain before any NPC will indemnify MB. First, plaintiffs must recover a judgment. They must overcome the likely summary judgment motions, win at trial and win on appeal. Second, if successful at the three litigation stages, the liability sharing provisions of the POR would then become operative. If some disagreement arose about the application of some of the provisions, the parties could take the matter to arbitration. Third, an NPC may never indemnify MB. The BOCs and AT & T could reach an agreement to alter or waive the POR provisions. Also, MB could settle this litigation and no liability sharing would occur under the express terms of the POR.

The court does not believe any of the exigencies outlined above, alone or in combination, significantly diminish the direct connection dictated by the POR between the NPCs and the inside wire contracts damages suit. The first exigency described in the preceding paragraph is the various phases of litigation plaintiffs will need to win at to recover. NPCs are contractually bound to indemnify MB if damages are awarded. While no one knows who will prevail in this litigation, the link between the BOCs and the NPCs is always present. The NPCs have a direct connection to this litigation *from the outset;* the POR rejoins the BOCs and AT & T into one system again. Plaintiffs' argument misses the mark because it confuses the always present contingency of plaintiffs winning with the *current certainty* that the POR applies to the NPCs.

The second exigency concerns the operation of the POR if a plantiffs' judgment is rendered. This argument is grounded on the speculation that somehow the POR will not work as it is written and authoritatively interpreted by Judge Greene. The potential that arbitration could reduce or eliminate an NPCs liability exists. The arbitration provision goes to the extent of liability of an NPC not to the current existence of contractual liability.

The third and fourth exigencies, settlement or agreement may eliminate all NPC liability, while facially appealing, are not relevant. The court is generally aware that a waiver of liability is possible and is certainly aware of the prevalence of settlements in civil litigation, indeed two inside wire cases have settled. Answer to Set IV Interrogatories No. 14. Both events noted by plaintiffs would eliminate any liability for the NPCs. Yet up until the time a waiver or settlement is signed, the POR provides a direct nexus—a legal umbilical cord—between this litigation and the NPCs. This *present* linkage is not vitiated by the possibility that at some later time it may be severed. Every ruling made by the court on discovery motions, evidence or jury instructions would have an impact on the course of the case whether favorable or adverse to either party. The current con-

nection amply demonstrates that the court's "financial interest" is within the "subject matter in controversy." The court cannot sit on this case under these circumstances and wait for the disqualifying connection to go away. The Motion to Recuse is granted.

## DISCOVERY AND SANCTIONS

Plaintiffs served interrogatories and requests to produce documents related to MB's Motion to Recuse. MB objected to several interrogatories and requests. Plaintiffs moved to compel answers and production of documents.

■ The discovery dispute arises because of the parties differing views of what evidence is relevant to the recusal motion. Under plaintiffs' theory, evidence on the interpretation of the POR is needed to determine if the court's "other interest" would be "substantially affected" by the outcome of this litigation. Brief in Support of Motion to Compel at 2-3. The court has rejected plaintiffs' interpretation of the proviso of subsection (b)(4) applicable to this motion. The court agrees with MB that plaintiffs' discovery requests are not relevant to the "financial interest" phrase of § 455(b)(4). As stated above, the contingencies plaintiffs ascribe to the liability sharing provisions of the POR do not vitiate the directness of the court's financial interest in the instant litigation. Discovery on the POR provisions is not necessary.

Plaintiffs also ask for discovery to determine if sanctions under Fed.R.Civ.P. 11 or 28 U.S.C. § 1927 are appropriate because of the allegedly frivolous filing of this motion. The court granted the Motion to Recuse. MB's filing of the motion was not frivolous; discovery is unwarranted.

Plaintiffs moved for sanctions under Fed.R.Civ.P. 11 and 28 U.S.C. § 1927 on the contention that MB's motion was frivolous and or filed to harass or delay the proceedings. The court has found the recusal motion valid and therefore denies plaintiffs' motions for sanctions based on the frivolousness of the motion.

■ The grounds of harassment or delay deserve some further consideration. The court's assessment of this issue is influenced by MB's failure to raise the problem *now* facing the court at the *first* hearing this court held on this case almost one year ago. The court declared its stock ownership in other BOCs at the first hearing; the court did not know about the POR. One of MB's principal contingent liability lawyers listened to the proceedings. Although MB stated it might have some problem with the court's stock interest, it did not raise the issue until *eight* months later. The potential problem created by the court's stock ownership is patently obvious *if* one knows about the POR. MB was aware of the POR contingent liability provision: 1) a primary attorney on this subject heard the court's admission and 2) MB had filed a notice of this pre-divestiture contingent liability the previous month. At the very least, Willis, MB's litigation counsel and contingent liability expert, should have raised the POR problem at the hearing or shortly thereafter.

MB admits "it was aware of the Plan of Reorganization" in February 1988. Brief in Support of Motion to Recuse at 4. MB's rationalization for its failure to raise the issue in February 1988 is extremely weak. MB correctly notes that the contingent liability provision is not operative unless a one million dollar judgment is rendered. They argue the POR was not in issue until the court certified the class because the damages of the named plaintiffs would not exceed the *deminimis* level. *Id.* at 3-4. MB's contention is technically correct but overlooks the realities of the judicial process. In essence, MB states to the court: We will disclose your disqualifying financial interest at the moment we think it becomes operative, even after the court requests that it get to the bottom of the telephone stock ownership problem. This attitude is intolerable.

First, MB's reasoning allows it to judge shop. MB can walk away from the table after it has sampled the judicial fare and found the taste unpleasant. Second, MB's attitude leads to a very inefficient use of scarce judicial resources. As happened in this case, the court became familiar with a

voluminous record and the contentions of the parties when it ruled on discovery motions and ordered class certification. Now this case must be reassigned to another judge who will have to devote considerable time and energy to reading the record, understanding past decisions and reviewing the motions currently before this court. The folly in MB's position is that this duplicative procedure could have been completely avoided with timely disclosure in February 1988 or some reasonable time thereafter.

MB's other justification for filing the Motion to Recuse in October 1988 is the United States Supreme Court decision of *Liljeberg v. Health Services Acquisition Corp.*, —— U.S. ——, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Both parties extensively dissected *Liljeberg* in briefs and at oral argument. This court reviewed *Liljeberg* on several occasions; it has little to do with the proffered basis for removal. The Supreme Court addressed two questions in *Liljeberg:*

> We must first determine whether § 455(a) can be violated based on an appearance of partiality, even though the judge was not conscious of the circumstances creating the appearance of impropriety, and second, whether relief is available under Rule 60(b) when such a violation is not discovered until after the judgment has become final.

108 S.Ct. at 2201. The first question is not at issue and the second only tangentially.

MB attempts to marshal some support from an isolated passage of *Liljeberg*, 108 S.Ct. at 2206. The Court noted in passing the Fifth Circuit's finding that the district judge violated § 455(b)(4). MB argues from the Court's comment and the facts of *Liljeberg* that disqualification under the "financial interest" proviso of subsection (b)(4) is warranted in this case. MB's claim neglects to consider the decision below. The Supreme Court did not identify the part of subsection (b)(4) invoked by the circuit court. The Fifth Circuit expressly stated it was the "any other interest" phrase of subsection (b)(4) the district judge violated and not the "financial inter-est" phrase MB relies on. 796 F.2d 796, 800 and n. 1 (1986) (en banc). MB's extraction from *Liljeberg* has no bearing on this case.

Both of MB's counsel's justifications for its conduct are very insubstantial. The inescapable conclusion is that MB chose to wait and see how this court would rule before playing its trump card. This conduct is blameworthy and dilatory and seemingly may implicate *Model Code of Professional Conduct* Rule 8.4(d) (prohibition to "engage in conduct that is prejudicial to the administration of justice") or *Model Code of Professional Responsibility* DR 1–102(A)(5) (same).

Nonetheless, MB's recusal motion is valid. A resolution of the type of "financial interest" held by the court and its effect was necessary at some point. It was an issue that could not be waived and implicated this litigation. 28 U.S.C. § 455(e). The court cannot say the motion to recuse unnecessarily delayed the litigation or increased its cost, Fed.R.Civ.P. 11, or unreasonably multiplied the proceedings, 28 U.S. C. § 1927, under these circumstances.

The court's decision to deny sanctions is based on its understanding that all of its prior rulings will stand. *Liljeberg* provides guidance on the validity of rulings prior to recusal. Although the *Liljeberg* Court's concern was with the validity of a final judgment after the trial court recused, the standard announced by the Court should apply to prior interlocutory rulings as well. The Court stated: "It is therefore appropriate to vacate the judgment unless it can be said that respondent did not make a timely request for relief, or that it would otherwise be unfair to deprive the prevailing party of its judgment." 108 S.Ct. at 2206.

Obviously, the court determines MB did not make a timely request for relief. Second, the court finds plaintiffs would be unfairly treated if the prior rulings were vacated. They apparently had no knowledge of the POR; one would normally expect that plaintiffs would bring up a judge's disqualifying financial interest in the opposing party. The court acknowledges that the POR was a matter of public

record in Judge Greene's order and was available to plaintiffs and the court. Clearly, the burden was on the party who knew about the POR, MB, to disclose the disqualifying interest in a timely manner. MB, however, chose to litigate in this court until it found the atmosphere not to its liking. MB is bound by all prior rulings. This court would recommend to the next trial judge heavy monetary sanctions against MB's counsel if any prior ruling is vacated under a contrary reading of *Liljeberg*.

IT IS BY THE COURT THEREFORE ORDERED that the Motion to Recuse is granted. IT IS FURTHER ORDERED that plaintiffs' Motion to Compel Discovery is denied. IT IS FURTHER ORDERED that plaintiffs' Motion for Sanctions is denied.