UNITED STATES of America,

v.

Ibrahim EL–GABROWNY, Defendant.

No. S3 93 Cr. 181 (MBM).

United States District Court,
S.D. New York.

Feb. 15, 1994.

Mary Jo White, U.S. Atty. for the Southern District of New York, Robert S. Khuzami, Andrew C. McCarthy, Asst. U.S. Attys., New York City, for U.S.

William M. Kunstler, Ronald L. Kuby, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

■■■■■ Based on the joint affidavit of his attorneys, defendant Ibrahim El–Gabrowny moves pursuant to 28 U.S.C. §§ 144 and 455 that I recuse myself on the ground that I follow the precepts of Orthodox Judaism and hold Zionist political beliefs. As explained below, the motion is without merit and is denied.[1]

### I.

The indictment in this case charges 15 defendants with participating in a far-reaching seditious conspiracy to conduct a war of urban terrorism against the United States through a series of violent acts in New York, both accomplished and proposed. These include principally the bombing of the World Trade Center in February 1993, the planned bombing of buildings and vehicular tunnels in June 1993, and the assassination of various public figures. The indictment contains no statement of the motive for these alleged actions, although defense counsel have averred, and it should be accepted for purposes of this motion, that it is the government's theory that these actions were undertaken in order to oppose United States' support for the State of Israel.

At a conference on July 15, 1993, the initial appearance after the filing of a since superseded indictment that charged a plan to bomb buildings and tunnels, one of El–Gabrowny's counsel alluded to the grounds he now asserts in this motion, and to other grounds he does not assert, when he declared:

> MR. KUNSTLER: You are our cross to bear, you know, and for many reasons that I won't go into at this moment. I don't think you are the right judge for this case, not only former U.S. Attorney but ethnic affiliation and you are going to be judging a case where the claim is that Jews were going to be destroyed on 47th Street, among other things.

(7/15/93 Tr. 15) He reiterated his intention to file such a motion on November 4, 1993.

1. Three organizations have moved to file submissions *amicus curiae*. The American Jewish Congress ("AJC") has sought to file a brief in opposition to the motion in which it stated initially that it was joined by the American Muslim Council ("AMC"). However, the court has received a letter from the AMC, forwarded initially in an envelope from counsel for El–Gabrowny, stating that its name may not be used in connection with the AJC brief. The AJC brief contains authority already known to the court and reviews familiar lines of argument on the propriety *vel non* of disqualifying particular people based on views attributed to the groups to which they belong. The National Council on Islamic Affairs and the American Arab Relations Committee propose to submit the affidavit of their Secretary General and President, respectively, Mohammad T. Mehdi. This affiant offers his own view, based on a summary of El–Gabrowny's version of certain rulings in the case and Mehdi's credentials as a Ph.D. in American constitutional law from Berkeley (Mehdi Aff. ¶ 5), that there is a "reasonable and general doubt" concerning my impartiality. (Mehdi Aff. ¶ 6) The usual rationale for *amicus curiae* submissions is that they are of aid to the court and offer insights not available from the parties. *United States v. Gotti*, 755 F.Supp. 1157, 1158–59 (E.D.N.Y.1991). At any rate, their acceptance is within the discretion of the court. *Id.* Neither of these submissions offers any argument or point of view not available from the parties themselves. Accordingly, both applications are denied.

(11/4/93 Tr. 17) No motion was made until January 18, 1994.

The motion was filed based on counsel's affidavit unaccompanied by a single citation to any of the vast body of case authority on the subject of recusal, and thus it becomes somewhat a matter of guesswork to fit counsel's rhetoric into the grid of governing legal principles. El–Gabrowny appears to argue that the combination of beliefs he hypothesizes generates a personal bias or raises sufficient suspicion that a reasonable person would question my impartiality in deciding issues of law in this case. He proffers his version—or, more accurately, his lawyers'—of various rulings and other events in the case thus far, apparently arguing that they are so unjustified as to raise the inference that they could have resulted only from the bias he alleges. Included within the motion is a series of inquiries demanding that I disclose relationships between me or members of my family to the third degree of consanguinity, and the State of Israel, such information apparently intended to disclose further evidence of ties to political Zionism.

## II.

The two statutes El–Gabrowny cites without explanation, 28 U.S.C. §§ 144 and 455, are the two that govern judicial disqualification, and are set forth in the margin.[2] As noted, there is a substantial body of case-law governing application of these statutes, none of it cited in El–Gabrowny's papers. The principles underlying that neglected case-law uniformly warrant denial of El–Gabrowny's motion.

 As a general matter, recusal motions are committed to the discretion of the judge who is being asked to disqualify himself, who is enjoined to "weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case. Litigants are entitled to an unbiased judge, not to a judge of their choosing." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir.1988) (citation omitted) ("*Drexel*"), *cert. denied sub nom. Milken v. S.E.C.*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). Which is to say, recusal motions should not be allowed to be

**2.** 28 U.S.C. § 144 provides as follows:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 455 provides, in relevant part, as follows:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. (b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

used as "strategic devices to judge shop." *Lamborn v. Dittmer,* 726 F.Supp. 510, 515 (S.D.N.Y.1989). Moreover, "[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *Drexel,* 861 F.2d at 1312.

## 1. Sections 144 and 455(b)(1)

■ Sections 144 and 455(b)(1), which require recusal when there is personal bias or prejudice, are construed *in pari materia. Apple v. Jewish Hosp. & Medical Ctr.,* 829 F.2d 326, 333 (2d Cir.1987); *see* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3542, at 556 (2d ed. 1984). In particular, both sections, and this is true for all subsections of § 455, are construed to require a timely application, which our Circuit reads as a "threshold" issue—*i.e.,* one to be evaluated before matters of substance are reached. *Apple,* 829 F.2d at 333.

■ The factors to be considered in evaluating timeliness include, but are not limited to, "whether: (1) the movant has participated in a substantial manner in trial or pretrial proceedings ... [or] (2) granting the motion would represent a waste of judicial resources." *Id.* at 334. This motion could be denied on that basis alone. It is apparent from the comments quoted above that counsel have known since July that they intended to file this motion, but did not do so. Since that time, I have dealt with numerous applications and motions relating to various defendants in this case, including El-Gabrowny. With respect to El-Gabrowny alone, these have included matters relating to discovery, attorney disqualification, restraints on attorney speech, and bail, among others. It could easily be held that granting the motion at this point would represent a waste of judicial resources. That, however, is only the most minor of the flaws that afflict this motion, and because recusal, after all, "strikes at the integrity of the judicial process," *In re International Business Machs. Corp.,* 618 F.2d 923, 927 (2d Cir.1980) (*"In re IBM"*), concern for that integrity recommends that I press on to matters of substance.

■ Sections 144 and 455(b)(1) require that the alleged bias be "personal" and "concerning a party." Here, what is required is a showing of bias in fact; these statutes do not deal simply with appearances, as does § 455(a). *United States v. Chantal,* 902 F.2d 1018, 1023 (1st Cir.1990); *Cool Light Co. v. GTE Prods. Corp.,* 832 F.Supp. 449, 457 (D.Mass.1993). Although the judge to whom an affidavit averring such bias is submitted "may not question either the truth of the allegations or the good faith of the affidavit, even if the judge knows to a certainty that the allegations of personal prejudice are false," *McCann v. Communications Design Corp.,* 775 F.Supp. 1506, 1523–24 (D.Conn. 1991) (Cabranes, J.) (citations omitted), that judge is not precluded "from putting the facts alleged into their proper context and examining the surrounding circumstances." *Id.* and cases cited therein. Moreover, because it is in the nature of a judge's job to rule, and any ruling must favor one side and disfavor the other, rulings during the course of a case generally are not regarded as evidence of bias, even if it is alleged that a disproportionate number favor one side. *Drexel,* 861 F.2d at 1314; *In re IBM,* 618 F.2d at 928–29.

■ Counsel's assertions with respect to rulings and other events in connection with this case, and the facts reflected by the record, are as follows: First, counsel assert that my response to a request that I direct those who run the Metropolitan Correction Center (the "MCC") to permit communal prayer by these Muslim defendants was that I was not concerned with "quality of life issues." In fact, the statement of which the quoted words are a part came in response to Kunstler's insistence on discussing his claim that his then-client, Omar Ahmad Ali Abdel Rahman, was confined to his cell 23 hours a day and could not attend the defendant meetings I had already intervened to arrange at the request of various attorneys in this case. When he kept interrupting, my full response was, "The quality of life issues are not my concern at the moment." (11/4/93 Tr. 27) With respect to communal prayer, as had been pointed out at an earlier conference, such prayer is not permitted to any group of defendants housed in the security classification of these defendants, regardless of their

religion. (8/26/93 Tr. 34) Indeed, another of defense counsel disclosed at that earlier conference that the defendants in this case were being permitted, albeit informally, to pray together, and I suggested at the time, and still do, that "you may do better informally than formally." (*Id.*) Second, counsel assert that I displayed disregard for defendants' religious practices by scheduling a court appearance on a Friday "over the defense objection that a long appearance would interfere with defendants' Juma observance," and that such objection was overridden in favor of my reliance on my own understanding of defendants' religious obligations. (Aff. ¶ 5) The record discloses there was no such objection. Counsel for defendant Amir Abdelgani expressed concern that a lengthy conference could interfere with Juma prayers, and was assured the conference would not be lengthy. That ended the discussion. (11/4/93 Tr. 38–39) As to my sources for whether conferences are permitted at all on Friday, they include counsel's own former client, Omar Ahmad Ali Abdel Rahman, himself a Muslim cleric. In October 1993, when a conference became necessary to deal with an issue relating to representation of Rahman, it was scheduled for a day other than Friday, and these defense counsel requested an adjournment. The conference was adjourned to Friday. The conference proceeded uneventfully, and certainly without protest that it was held on a Friday, either from counsel or from Rahman. (10/15/93 Tr. 4) Third, allegedly the most "revealing" indication of my bias was my statement in an opinion denying bail that El–Gabrowny was taking the position he could not return to Egypt because of his opposition to the government of Egypt, rather than that he could not return to Egypt because he and other Muslims were being persecuted in that country and for him to return would be to risk death. (Aff. ¶ 3) The point being made in

the opinion was simply that whether or not El–Gabrowny could flee to Egypt, a Muslim country, he could flee to another country. The opinion did not contain or purport to make a finding with respect to the human rights record of Egypt or any other country. Finally, counsel claim there has been a harsh response by the court to press leaks attributable to defendants but a lenient response to those originating with the government. (Aff. ¶¶ 30–32) The few early disclosures that apparently originated with government investigators were met with rapid censure (7/20/93 Tr. 17–19), and when disclosures continued that were of uncertain origin I directed the submission of sworn statements from law enforcement personnel and the opening of an investigation by the Justice Department's Office of Professional Responsibility. (8/5/93 Tr. 4–6; 8/13/93 order) On the other hand, when an order was entered directing that no material produced in discovery be disclosed publicly, and then violated with the release of transcripts these particular defense lawyers had urged be released, and these defense attorneys were quoted and recorded in statements attacking the credibility of prospective government witnesses in violation of Rule 7 of this Court's Criminal Rules (*See* Gov't Mem. 12/9/93 at pp. 9–11, 14–15) (quoting from tape recorded interviews), defense counsel were asked to submit affidavits with respect to the leaked transcripts, and no other action was taken.[3]

For the above reasons, there has been no showing under §§ 144 and 455(b)(1) sufficient to warrant recusal.

## 2. *Section 455(b)(5)(iii)*

▮▮▮ As noted above (see pp. 957–58, *supra*), I am somewhat disadvantaged by El–Gabrowny's failure to cite authority or even to refer to specific portions of the statutes he

---

3. Another example of anti-Muslim bias, this time directed at a lawyer, is perceived by counsel in my denial of El–Sayyid Nosair's request that Michael Warren, a Muslim, be appointed to represent him, even though Warren is not a member of the CJA panel. Counsel suggest that I based the denial initially on a lack of authority to appoint someone other than CJA counsel, and then when it was shown that the rules permit such appointment in unusual cases the ground

for denial was shifted. Here, counsel are misreading the second opinion as an acknowledgment that the first was based on a lack of authority. A perfunctory reference in the first opinion to a transcript in another case in which I said "I can't do it" apparently was read too literally. The reason I couldn't do "it"—*i.e.*, appoint a lawyer not on the panel—in either case was that it was unwarranted, for reasons the second opinion made explicit.

cites, and so it becomes necessary to draw textual clues from his submission as to what his lawyers may have been thinking when they drafted it. Counsel make assertions and seek information about me, my wife and our relatives to the third degree of consanguinity (Aff. ¶¶ 37–41), and the relationships any or all may have to the State of Israel. This may mean that El–Gabrowny is invoking § 455(b)(5), which requires recusal when the judge "or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person: ... (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."

The charges in this case involve acts of violence directed at people and places in this country, particularly in New York. Even if those who are charged with committing and planning such acts are alleged to have done so in part because they oppose United States support for the policies or the existence of the State of Israel, it is impossible to imagine any effect on Israel from the outcome of this case, whatever it may be, that can be described by a rational person as "substantial." *Cf. McCann,* 775 F.Supp. at 1543 (rejecting as "speculative" claim that opposing party might contribute to university at which judge's wife taught, enabling enhancement of salaries and benefits).

 Nor is El–Gabrowny's argument strengthened by the suggestion in his reply papers that Israel has been cast by the government's theory of the case as the victim of the World Trade Center explosion, and therefore any ties to that country would be ties to a victim. The victims of the World Trade Center explosion were the six people it killed, the hundreds it injured, and the thousands who felt its effects in other ways. If it is the government's theory that that explosion was a protest against United States policy, then the victims were targeted as Americans, in particular people who worked in New York. If the logic of El–Gabrowny's position about a relationship to victims were accepted, a more fundamental reason for my recusal would be that I am an American, in particular a New Yorker. That, of course, would compel the disqualification of every judge on this Court, if not in this country, and gives away the basic illogic of El–Gabrowny's position.

### 3. *Section 455(a)*

 Section 455(a), calling upon any judicial officer of the United States to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned," provides broader grounds for recusal than either § 144 or § 455(b). *Apple,* 829 F.2d at 333. It requires recusal not only when there is actual partiality, but also when there is " 'even the appearance of partiality.' " *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 860, 108 S.Ct. 2194, 2203, 100 L.Ed.2d 855 (1988) (quoting *Liljeberg,* 796 F.2d 796, 802 (5th Cir.1986)).

 However, to say that § 455(a) requires concern for appearances is not to say that it requires concern for mirages. The standard is an objective one, and is applied "not by considering what a straw poll of the only partly informed man-in-the-street would show—but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *Drexel,* 861 F.2d at 1313. "Section 455(a) was not meant to require disqualification every time one party can make some argument, no matter how unreasonable, that the appearance of prejudice would result." *Lamborn,* 726 F.Supp. at 516. Indeed, a "judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequence of his expected adverse decision.... Nothing in [§ 455(a) ] should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial." *Id.* (quoting S.Rep. No. 419, 93d Cong., 1st Sess. 5 (1973)). More particularly, "where an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality." *Drexel,* 861 F.2d at 1313.

 This is not the first time a judge has been called on to apply that standard to arguments like the ones being pressed here.

Judges of African–American descent have faced—and faced down—this sort of thing in both race- and sex-based civil rights cases, where their impartiality has been called into question on the ground that their race and their careers as civil rights advocates before they assumed the bench meant they could not be impartial. Two eminent judges of this Court had no difficulty sweeping aside that claim. *See Paschall v. Mayone*, 454 F.Supp. 1289, 1301 (S.D.N.Y.1978) (Carter, J.) (race discrimination); *Blank v. Sullivan & Cromwell*, 418 F.Supp. 1, 4–5 (S.D.N.Y.1975) (Motley, J.) (sex discrimination). Nor have others when presented with similar claims. *See Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir.1984) (motion to recuse Mormon judge on ground lawsuit involved "theocratic power structure of Utah"), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 785 (1985); *State of Idaho v. Freeman*, 507 F.Supp. 706, 729–33 (D.Idaho 1981) (motion to recuse Mormon judge on ground his former office in church predisposed him against Equal Rights Amendment). These and other cases have drawn both authority and inspiration from Judge Higginbotham's thorough and powerful opinion in *Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'rs*, 388 F.Supp. 155 (E.D.Pa.1974). That opinion is lengthy; to attempt to summarize it would do a disservice to both the opinion and its author. Besides, it is worth reading in full for its own sake. However, Judge Higginbotham did identify succinctly the fatal evil that infected the argument presented to him, and the one presented to me: "[T]he absolute consequence and thrust of [movants'] rationale would amount to, in practice, a *double standard* within the federal judiciary." 388 F.Supp. at 165 (emphasis in original). The objection here is not based on race or sex or the Mormon religion, but the motion in this case is in all relevant ways the same as the motions in those cases; it is the same rancid wine in a different bottle.[4]

The basic fact issue in this case is whether El–Gabrowny and the others named as defendants in this indictment made the agreements and committed the other acts charged with the requisite knowledge and intent. That issue will be decided by members of a jury. Even those jurors, who are the only factfinders in the case, will have no occasion to approve or disapprove the views of Jews or Zionists, or the detractors of either or both. Even they will not be asked to make a judgment approving or disapproving any views or beliefs of these defendants, or to apply their own views or beliefs. Still less so the presiding judge, whose only function is to determine and apply the law, subject to review on all rulings by the Court of Appeals.

Passing the historical curiosity that the standard El–Gabrowny advocates would disqualify not only an obscure district judge such as the author of this opinion, but also Justices Brandeis and Frankfurter, who would be barred from reviewing this case if they were alive and sitting today, each having been both a Jew and a Zionist, *see* P. Strum, *Louis D. Brandeis* 268 (Harvard University Press 1984), whether the presiding judge is an Orthodox Jew or a Zionist or some combination of the two, or neither, is utterly irrelevant to this case. That someone with an imagination or a motive might hallucinate relevance is not the standard, and therefore cannot provide the basis for decision. That is why I have not answered and will not answer the questions posed by El–Gabrowny's counsel about connections to Israel between me and my wife and our relatives to the third degree of consanguinity. To respond to such inquiries is to concede the relevance of the information.

There is no relevant fact, no principle of logic, and no rule of law that supports this motion. Accordingly, the motion is denied.

SO ORDERED.

---

4. These lawyers have used this approach before. In *United States v. El–Jassem*, 819 F.Supp. 166 (E.D.N.Y.1993), after Judge Jack B. Weinstein of the U.S. District Court for the Eastern District of New York imposed a sentence of 30 years on a convicted terrorist who tried unsuccessfully to set off three car bombs, counsel's response was reported as follows: "[Khaled Mohammed] El–Jassem's attorneys, William Kunstler and Ronald Kuby, condemned the sentence and accused Weinstein of being a Zionist with a 'lack of compassion' for anyone associated with the PLO." Pete Bowles, "30 Years for PLO Bomb Try," *Newsday*, Apr. 17, 1993, at 6.