**MACDRAW, INC., Plaintiff, Klayman and Associates, P.C., Larry Klayman and Paul J. Orfanedes, Appellants,**

**v.**

**CIT GROUP EQUIPMENT FINANCING, INC. and Richard Johnston, Defendants–Appellees.**

No. 97–7193.

United States Court of Appeals, Second Circuit

Argued May 15, 1997.

Decided Feb. 18, 1998.

---

Ramsey Clark (Lawrence W. Schilling, of counsel), New York City, for Appellants.

Before WINTER, Chief Judge, ALTIMARI, and CABRANES, Circuit Judges.

WINTER, Chief Judge:

Attorneys Larry Klayman and Paul J. Orfanedes appeal from Judge Chin's imposition of sanctions pursuant to then General Rule 4[1] of the Local Rules for the Southern District of New York. Judge Chin imposed the sanctions because Klayman and Orfanedes called into question his impartiality based on his having been appointed by the Clinton

---

1. Rule 4 was in effect at the time of Judge Chin's order and governs this appeal. We note, however, that Local Rule 4 has recently been replaced by Local Civil Rule 1.5, effective as of April 15, 1997. See NY Order 97–10.

Administration and on his race and ethnicity. Judge Chin's imposition of sanctions was well within his discretion. We therefore affirm.

## BACKGROUND

Klayman and Orfanedes represented Mac-Draw, Inc., an importer and seller of wire-drawing equipment, in this action against CIT Group Equipment Financing, Inc. ("CIT"). The case arose from a dispute over CIT's financing of a sale of equipment by MacDraw to Laribee Wire Manufacturing Company, Inc. The action was assigned to Judge Kram when it was commenced in August 1991.

In the fall of 1991, Klayman moved for partial summary judgment on behalf of Mac-Draw. Judge Kram had discouraged Klayman from filing such a motion because she perceived that the existence of an oral promise was a dispositive issue in the case and necessarily involved a dispute of fact precluding summary judgment. In April 1992, Klayman, having failed to make a timely demand for a jury trial, also moved for an order granting trial by jury. One month later, Klayman wrote a letter to Judge Kram requesting leave to file a motion for recusal on the ground that the court "has prejudged the case against the plaintiff." Judge Kram directed the parties to submit a briefing schedule for a recusal motion, but no such motion was ever filed.

In January 1994, Judge Kram issued an order that, *inter alia*, denied Klayman's request for summary judgment and a jury trial and granted defendants' cross-motion for monetary sanctions. *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 1994 WL 17952 (S.D.N.Y.1994). Klayman appealed from the imposition of sanctions, and we reversed. *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253 (2d Cir.1996). However, we specifically did not hold that Klayman's conduct was not sanctionable. Rather, we held only that the identification of such conduct by the district court was not sufficiently specific. *Id.* at 1261–62. Moreover, we expressed doubt as to the merits of one of MacDraw's major claims. *Id.* at 1260. Finally, we noted:

Our discussion should not be taken to suggest that we find the conduct of plaintiff's counsel throughout this litigation to be acceptable. Indeed, we note our sympathy with the district court's frustration; in pursuing this appeal, plaintiff's counsel submitted briefs that included inaccurate characterizations of the record and comments that we consider entirely inappropriate.

*Id.* at 1262.

The case was thereafter reassigned to Judge Chin. On November 13, 1996, during the bench trial and in open court, Judge Chin rendered a credibility decision on a dispositive issue and granted judgment for appellees pursuant to Fed.R.Civ.P. 52(c). Klayman then initiated an argumentative colloquy with the court in which he challenged the merits of its decision. Claiming that his client could not understand the use of Rule 52(c) to grant judgment on a dispositive issue during a trial, Klayman asked the court to "explain" the procedure to his client. Judge Chin declined to do so, and, unpersuaded by Klayman's attempts to reargue the legal questions just decided, brought the proceeding to a close.

On December 9, 1996, Judge Chin received a letter from Klayman and Orfanedes that stated in part:

Finally, as you may know, Mr. Orfanedes and I have been involved in very highly publicized and significant public interest litigation, *Judicial Watch, Inc. v. U.S. Department of Commerce*, Case No. 95–0133 (RCL), 1995 WL 450520 (D.D.C.), which involves a Mr. John Huang, Ms. Melinda Yee and other persons in the Asian and Asian–American communities. *See* Exhibit 1. Recently, we came upon a document in this case which mentions your name in the context of other prominent Asian–American appointees of the Clinton Administration. *See* Exhibit 2. Accordingly, could you please formally advise us whether you know either of these individuals, as well as what relationship, contacts, and/or business, political or personal dealings, if any, you have had with them, or persons related in any way to the Clinton Administration. Please also advise us if

you had seen the enclosed or similar newspaper articles or press accounts before this case was tried on November 6, 7, 12 and 13, 1996.

Klayman and Orfanedes attached, as Exhibit 1, seven newspaper and magazine articles reporting on a major political controversy over campaign contributions involving John Huang and the Democratic National Committee. Some of the articles mentioned Klayman as a member of Judicial Watch, an organization participating in a lawsuit against Huang in California. Exhibit 2 to the letter was a computer-generated print-out of an article that had appeared in *AsianWeek* more than two years before. The article discussed the Democratic Party's courting of Asian–American voters and noted that part of this effort involved appointing Asian–Americans to high-profile positions. It then listed six Asian–American presidential appointees, including Huang and Judge Chin. The article did not suggest any connection between the two, other than their having been appointed by the same administration and their being Asian–American.

On December 19, 1996, Judge Chin held a conference in open court and asked Klayman and Orfanedes to explain on the record the basis for the above-quoted letter. Klayman responded that Judge Chin had made negative remarks about the merits of MacDraw's case and appellants' conduct in litigating it and had indicated at the conclusion of the trial that post-trial motions would be futile. Klayman also indicated that his involvement in the California lawsuit, which implicated John Huang in the ongoing campaign-financing controversy involving the Clinton presidential campaign, may have caused Judge Chin to lose his impartiality in the present case, because both Huang and Judge Chin were Clinton appointees and Asian–Americans. When Judge Chin asked Klayman if he posed the questions in the December 9 letter because of Judge Chin's race, Klayman conceded that he had:

THE COURT: You are conceding that [in the December 9 letter] you asked questions of the court, at least in part, because of my race?

MR. KLAYMAN: In part. And let me tell you why. And I would [have] asked questions because you're also a recent appointee of the Clinton Administration. Has nothing to do with it. But you have been active, your Honor, for instance, in these kinds of efforts. And I commend you for your activity on behalf of the Asian–Americans, with regard to the Asian–American Legal Defense Fund and being a president of the Asian–American Bar Association. I myself have been active in similar types of things and am fully supportive of those activities.

But we are all human, and sometimes, sometimes subjective criteria can unwittingly, no matter how ethical, no matter how decent, no matter how honest someone is—and we believe you to be that—they can subjectively influence our decision-making. I, for instance, would not sit as a Jewish American on a case that involved a Palestinian. I wouldn't do it if I was a judicial officer just because of a lot of things which enter into the subjectivity of all our thinking.

Mr. Orfanedes spoke briefly and stated that he did not "see this as necessarily race-based." Speaking again, Mr. Klayman advised Judge Chin as follows:

[MR. KLAYMAN:] Now, I believe your Honor has to search his own soul to a large extent. There may be independent legal requirements here on whether or not you wish to advise this court of some of the questions which we asked, which are benign, which were posed in a very respectful way. We ask this letter be made part of the court record.

THE COURT: The letter has already been docketed. I am not going to search my soul. I do not need to do any soul searching at all. The letter is offensive. I find the letter to be offensive. I do not think it is benign nor do I think it is respectful. Not at all.

Judge Chin thereafter ordered Klayman and Orfanedes to show cause why they should not be sanctioned or disciplined pursuant to Local Rule 4 for violating Disciplinary Rules 1–102(A)(5) and 7–106(C)(6) of the Code of Professional Responsibility, N.Y.Jud.Law

App. Disciplinary Rule 1–102(A)(5) provides that a lawyer "shall not ... [e]ngage in conduct that is prejudicial to the administration of justice." Disciplinary Rule 7–106(C)(6) provides that, "[i]n appearing as a lawyer before a tribunal, a lawyer shall not ... [e]ngage in undignified or discourteous conduct which is degrading to a tribunal."

Klayman and Orfanedes submitted a letter brief arguing that their conduct was not degrading and did not prejudice the administration of justice. The letter insisted that Klayman and Orfanedes acted reasonably because Klayman's participation in a case that "elicited such angry responses from the White House, Democrats and the Asian–American community [may have caused] the Court [to] be angry at them and unable to be fair and impartial in a case in which they were counsel."

On February 5, 1997, Judge Chin imposed sanctions on Klayman and Orfanedes for violating Disciplinary Rules 1–102(A)(5) and 7–106(C)(6). The sanctions consisted of: (i) revoking appellants' *pro hac vice* status; (ii) denying any future applications by Klayman or Orfanedes to appear before Judge Chin on a *pro hac vice* basis; and (iii) ordering Klayman and Orfanedes to provide a copy of Judge Chin's opinion imposing sanctions to any other judge in the Southern District of New York to whom they may apply for *pro hac vice* status in the future.

### DISCUSSION

▇▇▇ We review the imposition of sanctions under Local Rule 4 for abuse of discretion, *see In re Gouiran*, 58 F.3d 54, 56 (2d Cir.1995); *In re Jacobs*, 44 F.3d 84, 87–88 (2d Cir.1994).

Local Rule 4 authorizes the disciplining of attorneys if, after notice and opportunity to be heard, they are found by clear and convincing evidence to have violated the Code of Professional Responsibility. *See* Local Rule 4(f). In the case of attorneys who are admitted *pro hac vice*, Local Rule 4 authorizes sanctions that include the precluding of the attorney from appearing at the bar of the court. *See* Local Rule 4(g). Local Rule 4(k) states that where the conduct at issue occurred in the presence of a judge or with respect to any matter pending before the court, the matter "may be dealt with directly by the judge in charge of the matter or at said judge's option referred to the committee on grievances, or both." [2]

We find no error in the sanctioning of Klayman and Orfanedes, much less an abuse of discretion. The December 9 letter posed interrogatories to the district judge strongly implying that he was not impartial based solely on his appointment by the Clinton Administration and on his being Asian–American. The subsequent hearing and briefing on the imposition of sanctions demonstrated that precisely such a suggestion was being made. Oral argument in this court confirmed that such was the purpose of the December 9 letter.

▇▇▇ The fact that a political controversy may be perceived by some as involving racial or ethnic aspects is not grounds for questioning in an entirely separate matter the impartiality of a judge of that race or ethnicity toward attorneys who are also involved in the controversy. Courts have repeatedly held that matters such as race or ethnicity are improper bases for challenging a judge's impartiality. *See United States v. El–Gabrowny*, 844 F.Supp. 955, 961–62 (S.D.N.Y.1994) (refusing to answer questions posed regarding judge's religious affiliation and connection, if any, to Israel); *Blank v. Sullivan & Cromwell*, 418 F.Supp. 1, 4 (S.D.N.Y.1975) (sex or race is improper basis for recusal); *see also Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'rs*, 388 F.Supp. 155, 163 (E.D.Pa.1974). A suggestion that a judge cannot administer the law fairly because of the judge's racial and ethnic heritage is extremely serious and should not be made without a factual foundation going well beyond the judge's membership in a particular racial or ethnic group. Such an accusation is a charge that the judge is racially or ethnically biased and is violating the judge's oath of office.

---

**2.** New Local Rule 1.5 omits the language of Local Rule 4 that allows the district court, rather than the grievance committee, to impose sanctions.

██ Nor should one charge that a judge is not impartial solely because an attorney is embroiled in a controversy with the administration that appointed the judge. Judges generally have political backgrounds to one degree or another but must be presumed, absent more, to be impartial. At least in the federal system, judges separate themselves from politics when going on the bench, and their life tenure reduces any felt reliance on political patrons. Indeed, a suggestion of partiality based on the appointing administration may often be a double-edged sword. If a Democratic appointee's impartiality toward lawyers publicly identified as active Republicans may be questioned, a Republican appointee's impartiality toward lawyers' adversaries might similarly be questioned on the ground that a Republican judge might favor the Republican lawyers. Finally, appointment by a particular administration and membership in a particular racial or ethnic group are in combination not grounds for questioning a judge's impartiality. Zero plus zero is zero.

We do not hesitate to hold that the suggestions regarding Judge Chin's impartiality violated the Code of Professional Responsibility. There is no factual basis for the suggestions made in the December 9 letter other than Judge Chin's appointment by the Clinton Administration and his race and ethnicity. Appellants, having suggested, but not having moved for, Judge Kram's recusal because of her perceived (by appellants) "prejudgment," found their desire for a new judge satisfied and proceeded to trial. Appellants correctly note that Judge Chin did express negative concerns about the merits of MacDraw's case and the conduct of appellants in litigating it. However, such remarks are common and often important to a trial court's administration of a case. Although they may occasionally wound counsel's pride, they can be informative and helpful to counsel who are not hypersensitive. Although it is not necessary to our disposition of this appeal, we note that

the panel hearing the previous appeal made analogous comments, describing one of MacDraw's claims as "troubling" and Klayman's brief as containing "inaccurate characterizations of the record and comments that we consider entirely inappropriate." 73 F.3d at 1260, 1262.

Because the suggestions in the December 9 letter entailed claims of partisan and racial bias with no factual basis, such charges were "discourteous" and "degrading" to the court. Disciplinary Rule 7–106(C)(6). They were also "prejudicial to the administration of justice." Disciplinary Rule 1–102(A)(5). The core constitutional obligation of a federal judge is to decide between adversary positions. A judge should be free to carry out that obligation without fear of insulting conduct or statements concerning his or her impartiality and integrity by the attorneys representing the losing party. Of course, professional advocates may lose perspective regarding the strengths or weaknesses of their case and find it difficult to conceal their feelings about an adverse decision immediately upon learning of it. Some tolerance must be shown by a court in such circumstances, as it was here, when Klayman exhibited pique in open court at the time of the adverse Rule 52(c) ruling. The December 9 letter came almost a month later, however. It was insulting and smacked of intimidation. Judge Chin was in no way required to tolerate it.

██ Nor were the sanctions imposed by Judge Chin excessive. In a similar situation, the Fourth Circuit affirmed the imposition of much harsher sanctions where the district court disbarred an attorney who accused a magistrate judge of having a "Jewish bias" in favor of the adversary. *In re Evans*, 801 F.2d 703, 704–06 (4th Cir.1986) (conduct violated DR 1–102(A)(5), 7–106(C)(6) and 8–102(B) and was "unquestionably undignified, discourteous, and degrading").[3]

---

3. Klayman has had his ability to appear *pro hac vice* revoked before. In the Central District of California, Klayman received the sanction for making misrepresentations to the court and for engaging in dilatory conduct. *See Baldwin Hardware Corp. v. Franksu Enter. Corp.*, 78 F.3d 550, 555, 562 (Fed.Cir.), *cert. denied*, —— U.S. ——,

117 S.Ct. 360, 136 L.Ed.2d 251 (1996). Disturbingly, Klayman on appeal accused the district judge of being anti-Asian and anti-Semitic. *Id.* at 555. The Federal Circuit affirmed the sanctions. *Id.* at 561–62. Although the Federal Circuit stated that Klayman never presented the issue of ethnic or racial bias to the district judge

Judge Chin therefore acted well within his discretion in imposing sanctions on Klayman and Orfanedes, and we affirm.

directly, *id.* at 557 & n. 4, Klayman admitted to Judge Chin that his sanctions in *Baldwin* resulted

from his accusing the district judge of being anti-Asian.