**UNITED STATES of America, Plaintiff,**

v.

**Yamil H. KOURI–PEREZ (01); Jeannette Sotomayor–Vazquez (02); Armando Borel–Barreiro (08), Defendants.**

**Criminal No. 97–091(JAF).**

United States District Court, D. Puerto Rico.

May 21, 1998.

---

**12.** Docket no. 53, exhibit A, at 147–51.

**13.** Docket no. 50, exhibit 2, at 68–70.

Maria A. Dominguez Victoriano, Asst. U.S. Atty. Guillermo Gil, U.S. Atty., San Jaun, PR, for U.S.

Benny Frankie Cerezo, Joaquin Monserrate–Matienzo, San Jaun, PR, for Kouri–Perez.

Francisco Rebollo–Casalduc, San Jaun, PR, for Sotomayor–Vazquez.

Yolanda Collazo, San Juan, PR, for Borel–Barreiro.

## OPINION AND ORDER

FUSTE, District Judge.

### I.

#### Facts

On December 30, 1997, a federal grand jury indicted Yamil Kourf–Pérez, Jeanette Sotomayor–Vázquez, Armando Borel–Barreiro, and six other defendants, for thirty-four counts, including one count of conspiracy to commit theft concerning a program receiving federal funds for the treatment of AIDS patients, seven counts of theft concerning a program receiving federal funds, one count of obstruction of a criminal investigation by bribery, twenty-four counts of laundering of monetary instruments, and one count of criminal forfeiture.

On June 23, 1997, this case was reassigned from the docket of another judge to the docket of this judge, who, after reviewing pending motions on file, noticed a definite and unsettling pattern. The pending motions contained personal attacks and imputations of misconduct. *See Docket Document No. 46,* p. 1, lines 25–31; p. 2, lines 7–10 and 29–37; p. 3, lines 9–13, and p. 4, lines 13–17; *Docket Document No. 48,* p. 2, ¶ 3. *See also Docket Documents Nos. 186 and 188.* To discourage the possibility of further attacks, an Order was entered on July 18, 1997 stating:

> Counsel representing all parties in this case are reminded that civility in litigation is a value that this court will protect and enforce. There will be no room for rushing imputations regarding the conduct of prosecutors and defense counsel. Each

attorney appearing in this case will treat other attorneys, all parties, and every witness in a civil, respectful, and courteous manner, both in written and oral communication. Disparaging personal remarks or acrimonious conduct will not be tolerated. The Canons of Ethics will be strictly enforced and the objective of all shall be to secure simplicity in procedure, fairness in the administration of the applicable principles of criminal justice, and the elimination of unjustifiable expense and delay. *See Gierbolini Rosa v. Banco Popular De Puerto Rico*, 171 F.R.D. 16 (D.P.R.1997); Local Rule (4)(B); Model Rules of Professional Conduct, 1983.

*Docket Document No. 100.*[1]

Unfortunately, even after the Order was entered, the pattern of personal attacks continued. *See Docket Document No. 116*, p. 1, lines 26–27, p. 2, lines 19–20, p. 3, lines 17–18, p. 5, lines 9–12; and *Docket Document No. 168*, p. 2, lines 1–7 and 22–23; p. 5, lines 11–14, 17–19, 22–26; p. 5, lines 33–36.

On February 25, 1998, during a status conference hearing, this court again cautioned counsel about making in appropriate statements and warned that such behavior would not be tolerated. This court informed the attending counsel, "we should try to concentrate on the facts and not on personalities. The truth of the matter is, if this is going to be a sample[ ] of what I expect to see at trial, I assure you that I will not allow it. You know I will not allow it.... Please, I am on my knees and I beg you to change the tone of your debate." *Docket Document No. 282, Transcript*, p. 60.

On April 29, 1998, three defendants, through their attorneys of record Benny Frankie Cerezo, Joaquín Monserrate–Matienzo, Francisco Rebollo–Casalduc, and Yolanda Collazo, (collectively "defense counsel"), filed a "Motion Requesting Modification of Order Authorizing Foreign Deposition," *Docket Document No. 410*. Previously, pursuant to Fed.R.Crim.P. 15, at the request of counsel Cerezo on behalf of defendant Kourf–Pérez, and without government objection, this court allowed the taking of the foreign deposition of Joaquín Pérez–Méndez, a citizen and resident of the Dominican Republic, in that country. The stated objective of the April 29 motion was to request that this court modify its Order to permit Pérez–Méndez to be deposed in the offices of his attorney, rather than in the United States Embassy, and also to allow Pérez–Méndez to have his attorney with him during the deposition for consultation.[2] Although a change in the circumstances of the deposition was the ostensible purpose of the motion, the document contains a series of accusations and allegations which fail to serve the stated end.

Transparently styled as the statements of Pérez–Méndez, the subscribing attorneys accused Assistant United States Attorney María Domínguez Victoriano ("Domínguez") of using "menacing", "heavy-handed and abusive" tactics to intimidate Pérez–Méndez and his wife. *Docket Document No. 410, p. 2.* They also asserted that Domínguez is the granddaughter of the former Dominican dictator Rafael Leonidas Trujillo y Molina and claimed that her "true name" is María León–Trujillo.[3] The motion contains the assertion that Pérez–Méndez was and continues to be intimidated by Domínguez because of her alleged genealogy and claims that the combination of Domínguez' position as an Assistant U.S. Attorney and her lineage "represents a lethal combination." *Id.* The motion ends by admitting that the prosecution never suggested a place for the deposition.[4]

---

**1.** The *Gierbolini* decision was entered by this court to vindicate attorney Benny Frankie Cerezo, who had been wrongly charged with willful violation of procedural rules.

**2.** We note that in the context of a deposition to perpetuate testimony for a criminal trial, consultation with an attorney during the deposition is not appropriate.

**3.** Rafael Leonidas Trujillo Molina (1891–1961) was a dictator who controlled the Dominican

Republic for more than thirty years. He was assassinated by military leaders on May 30, 1961. After Trujillo's death, his family fled from the Dominican Republic. Assistant U.S. Attorney María Domínguez was born on April 17, 1961. Therefore, when Trujillo died, Domínguez was six weeks old. FED.R.EVID 201(b) &-(c).

**4.** As a matter of fact, this court selected the site for the deposition, thinking in terms of providing the parties adequate facilities.

The government, through Domínguez, filed a response to defendant's motion. Assistant U.S. Attorney Domínguez denied the allegations regarding the use of unacceptable tactics, and explained that the government would have agreed to changing the place for the deposition "with a simple phone call." *Docket Document No. 415*, p. 1. The response also contains Domínguez' outrage at the assertion that she misrepresented her name, and states in pertinent part:

> [The] intended impact is to create the misimpression with the Court, the parties, and the public, that the undersigned Assistant United States Attorney, while serving in an official capacity, has incurred in illegal and immoral conduct, by acting under a false name....
>
> The propagation of this false information should be severely sanctioned by this Court. Counsel's conduct has not only clouded [Domínguez's] untarnished professional and personal reputation, but has also impacted the integrity of the overall judicial process in this case, through the dissemination of this misinformation in newspapers and radio transmissions throughout Puerto Rico.

*Id.* Moreover, the motion also clarifies that, as a teenager, Domínguez was adopted in Florida on June 17, 1975, making her true unmarried name María Domínguez. The adoption decree was filed under seal.

## II.

### *The May 15, 1998 Hearing*

On May 5, 1998, this court entered an Order to Show Cause as to why defense counsel subscribing to the motion should not be sanctioned. Through the Order, the court advised defense counsel that they should be prepared to specifically address the following issues:

1) whether the mention of national origin and ancestry of the prosecuting attorney in this matter constitutes an unwarranted-irrelevant and inflammatory litigation tactic that fails to advance any legitimate advocacy; 2) whether the contents of the motion or the actual motion were intentionally disseminated in violation of the gag order imposed by this court on July 30, 1997; 3) whether the motion in question violates the letter and the spirit of our order of July 18, 1887, *Docket Document No. 100,* and the specific directives and prohibitions discussed at the status conference of February 25, 1998; and, 4) whether the imposition of sanctions is called for considering the clear admonishment given by this court on a number of occasions demanding civility and professionalism in the handling of this case.

Two of the defense counsel, Benny Frankie Cerezo and Francisco Rebollo–Casalduc, through their own counsel, filed a response to the Order to Show Cause on May 13, 1998. *See Docket Document No. 433.*

This court held a hearing on May 15, 1998 to discuss the issues outlined in the Order to Show Cause and partially addressed in the response to the Order. At the hearing, counsel for Cerezo and Rebollo–Casalduc, José M. Quiñón, advised his clients not to answer questions by the court, and the court did not ask them any questions. However, the court gave both Cerezo and Rebollo–Casalduc the opportunity to speak unquestioned, which only Cerezo took. Attorney Quiñón presented arguments to the court and cross-examined the government's witness. Defense counsel Joaquín Monserrate–Matienzo and Yolanda Collazo both answered the questions of the court and explained their reasons for signing the motion. The court also heard argument from David Román and Gerardo Ortiz-del Rivero, counsel for Monserrate–Matienzo.

Along with the statements of defense counsel and their attorneys, the court heard testimony from Philip Irizarry, a special agent with the Federal Bureau of Investigation, who had first interviewed Pérez–Méndez. Assistant U.S. Attorney María Domínguez also expressed her views regarding defense counsel's actions.

From the testimony at the hearing, the court determined that defense counsel did not obtain an affidavit from Pérez–Méndez concerning his feelings about Domínguez or her alleged relationship to Trujillo. Moreover, the unrebutted testimony of Agent Iri-

zarry indicated that in March or April of 1997, Agent Irizarry and Domínguez interviewed Pérez–Méndez in the Dominican Republic without any major complication or objections. Agent Irizarry testified that Pérez–Méndez did not seem to know about Dominguez' alleged ancestry at the time of the interview. *Docket Document No. 441, Transcript,* p. 45. At the meeting, Domínguez was asked by Pérez–Méndez where she was from, and she told him that she was from Miami. Then Pérez–Méndez or his attorney asked whether she was Cuban, and she reiterated that she had spent a lot of time in Miami. *Id.* at pp. 63–64. Agent Irizarry testified that during the interview, Domínguez never revealed any relationship to Trujillo. *Id.* at p. 67.

At the hearing, attorney Yolanda Collazo stated that she believed the motion was filed in good faith and trusted the judgment of attorney Benny Frankie Cerezo, who authored the motion. She also expressed that she believed the motion reflected the words of Pérez–Méndez.

Attorney Joaquín Monserrate–Matienzo, who also answered questions asked by the court at the hearing, stated that he interviewed Pérez–Méndez and found that he was "in absolute fear" because he felt as though he had been threatened by the prosecution and would be arrested if he entered the United States Embassy. Monserrate–Matienzo also admitted that there have been delicate situations between the prosecution and the defense and explained that this was the reason the defense did not approach Domínguez about changing the place of the deposition prior to filing the motion. He also claimed that he had no intention of offending Domínguez.

Attorney Quiñón, representing Cerezo and Rebollo–Casalduc, argued that his clients acted in good faith and warned that the court's action could have a chilling effect on ardent and efficient defense advocacy.

### III.

#### Authority to Issue Sanctions

#### A. Inherent Power

It is well established that federal courts possess those inherent powers which "are necessary to the exercise of all others." *United States v. Hudson,* 7 Cranch (11) U.S. 32, 34, 3 L.Ed. 259 (1812). Part of the court's inherent power is the authority to sanction counsel for misconduct and to "assess expenses ... against counsel who willfully abuse judicial process." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *see also In re Córdova González,* 726 F.2d 16, 20 (1st Cir.1983) (using the court's inherent power to sanction an attorney in a criminal case who withdrew representation eight days before trial date); *Ramos Colón v. United States Attorney for District of Puerto Rico,* 576 F.2d 1, 3 (1st Cir.1978) (stating, " 'the inherent power of the court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it' " (quoting *Flaksa v. Little River Marine Construction Co.,* 389 F.2d 885, 888, (5th Cir.1968))).

#### B. 28 U.S.C. § 1927

Along with the inherent power of the judicial office, courts also have the statutory authority to sanction attorney misconduct under 28 U.S.C. § 1927, which provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

The Court of Appeals for the First Circuit does not require a finding of subjective bad faith in order to impose sanctions under § 1927. *Cruz v. Savage,* 896 F.2d 626, 632 (1st Cir.1990). Sanctions under § 1927 are appropriate when counsel's conduct has multiplied the proceedings and, in doing so, has been unreasonable and vexatious, in the sense of being harassing or annoying. *Id.* While negligence, inadvertence or incompetence does not mandate sanctions, actions taken in disregard of whether the conduct is

harassing or vexatious may result in sanctions under this section. *Id.*

## IV.

### *Analysis*

The crux of the determination as to whether defense counsel should be sanctioned is whether counsel willfully abused judicial process or whether their actions unreasonably multiplied the proceedings. Defense counsel's actions warrant sanctions under both standards.

Prior to filing the motion requesting the modification of an order authorizing the foreign deposition, defense counsel did not contact Domínguez, by phone or in writing, to ask if she would agree to change the place of the deposition. Instead of using this informal litigation dispute resolution mechanism, *see* Fed.R.Crim.P. 15(d); Fed.R.Civ.P. 26(c), and Local Rule 311.11, defense counsel made a gratuitous and public personal attack on Domínguez. In so doing, they violated this court's explicit orders to refrain from such conduct, made misrepresentations to the court about Domínguez' name, broke ethical rules, offended basic notions of the privacy of one's family, and violated the Rules of Criminal and Civil Procedure. In this day and age, where modern legal systems reject distinctions based on race, color, national origin, religion, ancestry or lineage, this court is confronted with a disturbing affront to these norms.

In our July 18, 1997 order, this court made perfectly clear that we would not stand for personal attacks. We echoed this sentiment in the February 25, 1998 status conference. Defense counsel did not listen. Instead, they decided to attack Domínguez in the most personal way possible, by making allegations about her family and her ancestry. Trujillo's worldwide reputation as an oppressive dictator is not a secret to this court, to the press or to the potential jury pool.[5] Undoubtedly, the allegation that Domínguez is related to

Trujillo is not something that she, or any reasonable person in her position, would want to be brought before this court in a public document. The only acceptable reason for delving into a court officer's background would be if her ancestry were a relevant issue in this case. However, defense counsel has not provided any legitimate evidence or argument explaining how the alleged ancestry of Domínguez, who was only six weeks old at the time of Trujillo's death, is relevant to this case or to the motion. Defense counsel has shown neither that Domínguez used her ancestry as a trial tactic nor that, to the extent that Pérez–Méndez knew her heritage and was influenced by it, any such influence was relevant to the success of the motion. Defendants were making a simple request, one that would have been granted with a phone call or fax to opposing counsel or with a straightforward motion to the court. Even if Pérez–Méndez was absolutely terrified of Domínguez, defense counsel knew that Pérez–Méndez' phobia about Trujillo was unjustified in this day and age, and defense counsel had nothing legitimate to gain by making Domínguez' ancestry the focus of this tribunal.

Along with unnecessarily delving into Domínguez' alleged ancestry, defense counsel misrepresented Domínguez' name to the court and strongly implied that she was hiding her true identity by using an assumed name. This behavior is unacceptable. Aside from the fact that defense counsel's statement was simply untrue, the nature of the misstatement is particularly offensive.[6] Both Puerto Rico and Florida have statutes mandating that when a child is adopted, under law, she must be treated as though she was born to her adoptive parents in wedlock and her name will be changed to reflect this. 31 L.P.R.A. §§ 534, 535, 538 (1997); Fla.Stat. Ann. § 63.172 (West 1997). Moreover, both jurisdictions have statutes which are intended to keep the circumstances of an adoption

---

**5.** The press immediately reported this story and, within two hours of when the motion was filed, this court heard about the claimed relationship between Domínguez and Trujillo, which was broadcast on the radio news. This story was also covered by major newspapers in Puerto Rico.

**6.** It should be noted that counsel Cerezo, quoting the April 29 motion, reiterated to this court during the May 15 hearing that "AUSA Dominguez' true name is María León Trujillo." *Docket Document No. 441, Transcript,* p. 85.

secret. 32 L.P.R.A. §§ 26991, 2699s (1997); Fla.Stat.Ann. § 63.162 (1997). Both Puerto Rico and Florida recognize what defense counsel do not: When a child is adopted her true name becomes her adoptive name. To imply otherwise offends public policy and the clear legislative purpose behind Puerto Rico and Florida statutes, and will not be allowed by this court.

■ Defense counsel's behavior is also worthy of sanction because it unnecessarily intruded into the private life of a colleague and an officer of the court. Both the Puerto Rico and the United States Constitutions protect rights of privacy. In Puerto Rico, invasion of one's privacy is actionable even against a private citizen. *See generally,* P.R. Const. art. II, § 8; *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (recognizing the constitutional penumbra of privacy under the First, Third, Fourth, Fifth, Ninth, and Fourteenth Amendments); *Arroyo v. Rattan Specialties, Inc.,* 117 D.P.R. 35, 58–61 (1986). While this court does not attempt to vindicate Domínguez' right of privacy, this court does not operate in a vacuum. The law operates as a window into societal norms and provides insight into what is objectively inappropriate. Such a blatant and deliberate intrusion into the background of a court officer is absolutely impermissible and should not have been included in a motion filed before this court. Counsel's attempt to shield that reference by placing words in Pérez–Méndez' mouth is not convincing. Defense counsel did not offer an affidavit from Pérez–Méndez supporting their statements about his beliefs, and the testimony from FBI agent Irizarry at the hearing cast serious doubt on whether Pérez–Méndez was even aware of Domínguez' alleged ancestry. Based upon the unrebutted testimony of Agent Irizarry, it is certainly a possibility that the entire discussion of Pérez–Méndez' fears was merely a pretext used by defense counsel to expose Domínguez' background to the court and the public. Moreover, as this court stated above and at the hearing, even if Pérez–Méndez were intimidated by Domínguez because of her ancestry, his groundless fear does not justify defense counsel's mention of Domínguez'

background in a motion filed before this court.

■ Defense counsel's statements also warrant sanctions because they were in contravention of Rules 3.5(c) and 8.4(d) of the Model Rules of Professional Conduct, thereby violating Rule 211(4)(B) of the Local Rules of this court, which incorporates the Model Rules. *See In re Córdova–González,* 996 F.2d 1334 (1st Cir.1993) (finding attorney's vitriolic comments in contravention of Rules 3.5(c) and 8.4(d) and grounds for disbarment); *cf., MacDraw, Inc. v. CIT Group Equipment Financing, Inc.,* 138 F.3d 33 (2d Cir.1998) (finding that the intimation that a court officer was biased because of his ancestry violated New York equivalent of Rules 3.5 and 8.4(d) and warranted severe sanction). Rule 3.5, governing Impartiality and Decorum of the Tribunal, states: "A lawyer shall not: ... (c) engage in conduct intended to disrupt a tribunal." Rule 8.4, governing Misconduct, states: "It is professional misconduct for a lawyer to: ... engage in conduct that is prejudicial to the administration of justice." Both alone and in concert, these rules articulate a standard governing the behavior of attorneys when they file papers or appear before a tribunal. When an attorney files motion papers which contain false statements and unnecessary and offensive references to ancestry, this standard is violated. As we stated in our July 18, 1997 order, we will not tolerate violations of our ethical rules.

Along with violating ethical rules, by not asking Domínguez if she would agree to a change in the location for taking Pérez–Méndez' deposition before filing the motion, defense counsel violated the Federal Rules of Criminal and Civil Procedure, as well as the Local Rules of this District. Fed.R.Crim.P. 15(d) provides that depositions in criminal cases should be taken in the manner provided by the Federal Rules of Civil Procedure. Fed.R.Civ.P. 26(c) provides the procedure for taking depositions and states that if a party wishes to protect a deponent, they must file a motion "accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute with-

out court action." Moreover, the Local Rules of Court require that for any,

> [m]otion or objection relating to discovery pursuant to Rule [ ] 26 ... counsel for each of the parties concerned shall confer in advance of filing in a good-faith effort to eliminate as many of the disputes between parties as possible, or to eliminate the necessity of filing such a motion or objection. It shall be the responsibility of counsel for the movant to arrange for the conference.

LOCAL RULE 311(11). Therefore, defense counsel should not only have asked Domínguez about changing the location before filing the motion, but also they should have attached a certification to the motion verifying that such a request had been made. The fact that defense counsel violated the Federal and Local Rules by not making an effort to resolve this issue before filing the motion is further evidence of defense counsel's bad faith.

In imposing sanctions, we are mindful that we should not impose them "to chill an attorney's enthusiasm, creativity or zealous advocacy." *Cruz*, 896 F.2d at 634. Contrary to what was argued at the hearing, however, the issue is not about "style" but about content. Simply stated, the allegations in the motion went far beyond the bounds of zealous advocacy. This court has asserted, "there is a point beyond which zeal becomes vexation, the 'novel' approach to a legal issue converts to frivolity...." *Cruz v. Savage*, 691 F.Supp. 549, 556 (D.P.R.1988). As we have repeated again and again, there was no reason for defense counsel to bring Domínguez' ancestry to the attention of this court and the public. If defense counsel were to have advocated zealously for their clients, they would have buried any personal vendetta, called Domínguez, and asked if she would agree to a change of location. This court will not allow a court officer's background to become a trump card to be played by opposing counsel to obtain a strategic advantage. We believe sanctions are the only way to condemn and prevent any such future activity.

## V.

### Sanctions

As we have explained in depth above, defense counsel's actions warrant sanctions. Using our inherent powers and our statutory authority under 28 U.S.C. § 1927, we reprimand Benny Frankie Cerezo, Joaquín Monserrate–Matienzo, Francisco Rebollo–Casalduc, and Yolanda Collazo for the objectionable content of the motion filed on April 29, 1998, and impose an aggregate monetary fine of $4,000. This court imposes the monetary sanction to vindicate the time and effort devoted by the government, the court, and court personnel to this incident and to steer this case back on to a civil, respectful, and courteous course.

We do not see the need to justify the monetary sanction with the government time sheet documenting the hours devoted to this effort and the expense incurred. *See generally, In re Córdova González*, 726 F.2d 16 (1st Cir.1984) (upholding district court's imposition of $6,300 dollar sanction, of which $4,176.60 were documented costs and $2,323.30 were estimated costs); *Kleiner v. First National Bank*, 751 F.2d 1193 (11th Cir.1985) (affirming lower court's use of inherent power to fine errant attorneys $50,000 and justifying severity of penalty by stating, "[i]n view of counsel's arrogance and the millions of dollars which hung in the balance, the size of the fine assessed by the court was entirely commensurate with the willfulness and gravity of counsel's misconduct. Unless severe sanctions are imposed ... the deterrent function of sanctions will not be achieved" (citations omitted)); *In re Sanction of Baker*, 744 F.2d 1438 (10th Cir.1984) (upholding monetary sanction which was imposed by the district court under its inherent power, based on the estimated expense to the court, and intended to convey a message about trial process). The amount of the sanction is modest when compared to the gravity of the transgression committed by defense counsel, especially considering that defense counsel had been previously warned twice. This court alone has devoted over forty hours to this process, and court resources were expended in an extended hearing. When one examines the circumstances that led to this court's invocation of its inher-

ent and statutory powers to correct the wrong done and to dissuade any future violation, it is difficult to describe the sanction as other than conservative.

The $4,000 monetary sanction shall be paid on the basis of any pro rata division agreed to by counsel, which should account privately for their respective responsibility or, in the alternative, on the basis of a per capita $1,000 share for Cerezo, Monserrate–Matienzo, Rebollo–Casalduc, and Collazo.

The monetary sanction shall be paid at the Clerk's Office **on or before May 31, 1998 under penalty of civil contempt.** Moreover, counsel are advised that any future violation of the civility order of June 18, 1997 and the directions to counsel at the February 25, 1998 status conference, or any future violation of the July 30, 1997 gag order,[7] may result in criminal contempt under Fed. R.Crim.P. 42.

**IT IS SO ORDERED.**

San Juan, Puerto, Rico, this 21st day of May, 1998.

---

7. While this court expresses its grave concern over the "lightning speed" with which the information contained in the motion reached the radio broadcasting journalist—the motion was filed at 2:57 P.M. on April 29, and at about 4:45 P.M. the undersigned heard the broadcast that Domínguez was Trujillo's granddaughter on radio station WUNO, 1320 am—this issue was not fully developed at the hearing or in the documents filed previously. Consequently, this factor plays no role in the court's decision. All counsel are warned, however, that there is a strong suspicion of violations to this court's gag order of July 30, 1997. WUNO has no radio reporters assigned to the district court and the intake clerk on duty April 29, 1998 confirmed to the court that no radio reporter from WUNO requested the order. Therefore, it is only appropriate to indicate that any future violations of the gag order will be swiftly punished.